**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARTHUR LOURDES LENIX, | ) Case No.: 1:09-cv-01683-AWI-JLT |
| Petitioner, | ) |
| | ) FINDINGS AND RECOMMENDATIONS TO |
| v. | ) DENY FIRST AMENDED PETITION FOR WRIT |
| | ) OF HABEAS CORPUS (Doc. 30) |
| DOMINGO URIBE, JR., Warden, | ) |
| | ) ORDER DIRECTING THAT OBJECTIONS BE |
| Respondent. | ) FILED WITHIN TWENTY-ONE DAYS |
| | ) |
| | ) ORDER GRANTING PETITIONER'S REQUEST |
| | ) FOR JUDICIAL NOTICE (Doc. 32) |
| | ) |

Petitioner is a state prisoner proceeding pro se counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**

Petitioner is in custody of the California Department of Corrections and Rehabilitation serving an indeterminate sentence of 50 years-to-life pursuant. (Lodged Document "LD") 2. This sentence was imposed after he was convicted by a jury in 2005 in the Superior Court of California, County of Kern (the "Superior Court") (1) first degree murder (Cal. Pen. Code §§ 187(a)); (2) attempted first degree murder (Cal. Pen. Code §§ 187(a), 664(a); (3) conspiracy to commit murder (Cal. Pen. Code §§ 182(a)(1), 187(a); (4) possession of a firearm by a convicted felon (Cal. Pen. Code § 12021(a)(1); and (5) possession of a loaded firearm in a public place by an active participant in a criminal street gang

1

(Cal. Pen. Code § 12031(a)(2)(C).  (Id.)  The jury also found true special allegations (1) of intentional firearm discharge proximately causing great bodily injury or death (Cal. Pen. Code § 12022.56(d); (2) premeditation and deliberation in the attempted murder charge (Cal. Pen. Code §§ 189, 664(a); (3) personal and intentional firearm discharge (Cal. Pen. Code § 12022.53(c)); and (4) personal firearm use (Cal. Pen. Code § 12022.5(a)).  (Id.).  At a bifurcated trial, the trial court found true special allegations of prior prison terms pursuant to Cal. Pen. Code § 667.5(b).  (Id.).

The trial court imposed a 25-year-to-life term sentence for the first degree murder conviction, a consecutive 25-to-life term for personal and intentional firearm discharge proximately causing great bodily injury or death, and a consecutive one-year term for a prior prison term.  (Id.).  The court also imposed a consecutive term of life with the possibility of parole for attempted murder and a consecutive term of 20 years for personal and intentional firearm discharge, a stayed 25-to-life term for conspiracy to commit murder, and a consecutive 25-to-life term for personal and intentional firearm discharge proximately causing great bodily injury or death, a concurrent aggravated term of three years for possession of a firearm by a convicted felon, and imposed a concurrent aggravated term of three years for possession of a loaded firearm in a public place by an active participant in a criminal street gang.  (Id.).  In sum, Petitioner was sentenced to a total indeterminate term of fifty years to life plus determinate terms totaling 21 years.

Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which affirmed Petitioner's conviction on October 13, 2006. (LD 7).  On November 14, 2006, Petitioner filed a petition for review in the California Supreme Court that, on January 24, 2007, was granted as to whether the prosecutor had engaged in racial discrimination during jury selection. (LD 11).  The issue was briefed and, on July 24, 2008, the California Supreme Court issued a published opinion affirming the judgment.  (LD 16; People v. Lenix, 44 Cal.4th 602 (2008).

Petitioner subsequently filed a series of state habeas corpus petitions aimed at exhausting additional claims contained in the first amended petition herein, the last of which was denied on August 31, 2011.  (LD 20-31).

On September 23, 2009, Petitioner filed the original petition.  (Doc. 1).  Subsequently, Petitioner requested, and was granted, a stay of proceedings while he attempted to exhaust additional

1    claims. (Doc. 12). On December 27, 2011, after exhausting additional grounds in state court, Petitioner

2    filed the instant first amended petition. (Doc. 30). Respondent's answer was filed on March 5, 2012.

3    (Doc. 36). On May 29, 2012, Petitioner filed his Traverse. (Doc. 42). On March 13, 2014, Petitioner

4    filed a motion to stay proceedings until he received his legal materials, which he alleged were

5    confiscated by prison officials. (Doc. 50). Respondent has opposed that stay request on the grounds

6    that Petitioner does not need to exhaust additional grounds, that he does not presently need his legal

7    materials, and that, if and when he does for preparing objections to any adverse Findings and

8    Recommendations, he can request an extension of time. (Doc. 51).

9         Respondent concedes that the all grounds for relief in the petition have been fully exhausted.

10   (Doc. 36, p. 17).[1]

11                              **FACTUAL BACKGROUND**[2]

12        Curtis and Lamar Rufus were cousins who were practically like brothers. (Volume 3, Reporter's

13   Transcript ("3 RT") 182. After 1:30 a.m. on September 19, 2002, Curtis and Lamar decided to go to a

14   nightclub called "Rockin' Rodeo." (Id. at 182-183). The cousins drove Curtis's 1991 blue Chevrolet

15   Caprice. (3 RT 183). After leaving the nightclub, the two men returned to where Lamar's 1990 Lexus

16   was located and the two drove their respective cars to a Fastrip store in downtown Bakersfield. (3 RT

17   184). Curtis went inside the Fastrip to get a bottle of water while Lamar waited outside; however,

18   before Curtis could purchase his water, he noticed "quick movements" outside as if people were in a

19   hurry to leave the store. (3 RT 187). Curtis went outside to talk to Lamar and the two cousins decided

20   it was best to leave the store, but they waited until some of the other cars cleared out of the parking lot

21   first. (Id., p. 188). As the two men went to their respective cars, which were parked next to each other

22   near an alleyway adjacent to the Fastrip parking lot, they encountered Petitioner and Glenn Maurice

23   Johnson. (Id., p. 189). Curtis knew Johnson, who had attended high school with Lamar, but was not a

24

---

25   [1] On December 27, 2011, Petitioner filed a motion requesting that the Court take judicial notice of the 5th DCA's published
     decision in People v. Johnson, 142 Cal.App.4[th] (2011), as well as the preliminary hearing transcripts of that case and the

26   transcripts of Petitioner's first trial. (Doc. 32). Although the motion is now somewhat redundant since both parties have
     relied extensively on both the transcripts at the first trial as well as the 5th DCA's decision in Johnson, the Court, in an

27   effort to do some judicial housecleaning, will grant the motion.
     [2] The 5th DCA's opinion did not contain a formal statement of facts and the California Supreme Court's published decision

28   addressed only a single narrow legal issue. Accordingly, the Court has collected the salient evidence from the record and
     presented it herein.

close friend of Curtis's and he did not recall his name that evening.  (Id. at p. 190).

Curtis had first seen Petitioner about a week earlier when Curtis and Lamar were at another Fastrip store and Petitioner had walked up to the two men and greeted them.  (3 RT 192).  Petitioner's greeting was not friendly but abrupt and then he walked away.  (Id. at 193).  Curtis asked his cousin about Petitioner, and Lamar told him his nickname was "Little Mobe" or "Peanut."  (Id.).  Curtis also noticed that Petitioner was either missing a front tooth or it was badly decayed.  (Id.).

On the night of the crimes, as Curtis and his cousin walked past Johnson and Petitioner, Curtis gently tapped Johnson on the chest to wake him up because he appeared to be intoxicated.  (Id. at 194). Shortly afterward, Curtis heard a sound like a bottle hitting the ground but not breaking.  (3 RT 195). Both Curtis and Lamar turned around and saw Petitioner picking something up from the ground and tucking it inside his waistband.  (Id. at 195).  Petitioner then walked away from the two men southbound in the alley. (Id.).  Lamar told Curtis that the object Petitioner had dropped and then picked up was a .38 handgun.  (Id.).

The cousins were concerned about Petitioner having a weapon so they returned to their respective vehicles and started the engines.  (Id. at 196).  At that point, another individual, Deshonte Grayson, came over to the passenger door of Lamar's car and opened the door, said something to Lamar, after which both Curtis and Lamar got out of their cars.  (Id. at 197-198).  Curtis told his cousin they ought to leave as it appeared to Curtis that Grayson, and perhaps the other two men, were attempting to "stall" the cousins and keep them from leaving.  (Id. at 198).  Curtis slowly drove his car away from Lamar's to give his cousin room to leave.  (Id.).  As Curtis started to drive up the alley, he noticed that Lamar had gotten out of his car and was now talking to Grayson.  (Id. at 200).  Curtis immediately backed up his car and returned to his cousin, who was standing by the driver's door talking to Grayson, who was standing near the front passenger door.  (Id. at 201).

Curtis then saw Petitioner come up behind Lamar in his blind spot, raise the handgun, and shoot at Lamar's head two or three times.  (3 RT 202).  Lamar collapsed by his car.  (Id.).  Petitioner then began to slowly walk eastward, as did Grayson.  (Id. at 203).  Curtis drove his car toward his fallen cousin.  (Id. at 204).  Grayson began walking toward Curtis while Petitioner stepped off to the side of the alley and fired several shots at Curtis.  (Id. at 205-206).  Curtis was trying to run down Grayson

4

while Petitioner was firing his weapon at the car; suddenly, Grayson disappeared and Curtis believed he had been shot by Petitioner.  (Id. at 207).  Petitioner then got into the passenger side of a red compact car that had pulled up to him; as the car drove off, Curtis saw that Johnson was the driver.  (Id. at 209). Curtis followed the car for a short time and then returned to where his cousin had fallen.  (Id. at 211). Lamar was still breathing so Curtis used his cousin's cell phone to call 911 and, later, Lamar's family. (Id. at 212).  Curtis attempted CPR on his cousin until the ambulance arrived.  (Id.).

When the police arrived, Curtis related the events to Detective Krueger.  (3 RT at 214).  Curtis told Krueger of Petitioner's gang nicknames.  (Id. at 222).  Lamar was later pronounced dead from a gunshot wound to the head.  (4 RT 409).

Officer Martin Heredia testified that the police went to a Bakersfield address on information that Petitioner was present and, while surveying the scene, Heredia saw Petitioner walk furtively out the back of the apartment.  (3 RT 232).  Heredia announced that the police were there and prepared to arrest him, but Petitioner retreated inside the apartment.  (Id. at 233).  Shortly thereafter, Petitioner was taken into custody.  (Id.).

## DISCUSSION

I.      Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore

1    governed by its provisions.

2        II.       Legal Standard of Review

3        A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he

4    can show that the state court's adjudication of his claim:

5        (1)  resulted in a decision that was contrary to, or involved an unreasonable application of,
               clearly established Federal law, as determined by the Supreme Court of the United States;

6              or
         (2)  resulted in a decision that "was based on an unreasonable determination of

7              the facts in light of the evidence presented in the State court proceeding."

8    28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

9        A state court decision is "contrary to" clearly established federal law "if it applies a rule that

10   contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

11   that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

12   Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406.  A state court

13   decision involves an "unreasonable application" of clearly established federal law "if the state court

14   applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Id.,

15   quoting Williams, 529 U.S. at 409-410; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).

16       Consequently, a federal court may not grant habeas relief simply because the state court's

17   decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable.

18   Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).  In

19   Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court explained that an

20   "unreasonable application" of federal law is an objective test that turns on "whether it is possible that

21   fairminded jurists could disagree" that the state court decision meets the standards set forth in the

22   AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Richter, 131 S.Ct. at 786.

23   As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an

24   unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose

25   of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in

26   the state criminal justice systems,'" and not as a means of error correction.  Richter, 131 S.Ct. at 786,

27   quoting Jackson v. Virginia, 443 U.S. 307, 332, 99 S.Ct. 2781, n. 5 (1979)(Stevens, J., concurring in

28   judgment).  The Supreme Court has "said time and again that 'an *unreasonable* application of federal

law is different from an *incorrect* application of federal law.'" <u>Cullen v. Pinholster</u>, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Richter</u>, 131 S.Ct. at 787-788. Put another way, a state court's determination that a claim lacks merit bars federal habeas relief so long as "fairminded jurists could disagree" on the state court's decision.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  <u>Cullen</u>, 131 S.Ct. at 1398 ("This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2). This prong pertains to state court decisions based on factual findings.  <u>Davis v. Woodford</u>, 384 F.3d at 637, citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Wiggins v. Smith</u>, 539 U.S. at 520; <u>Jeffries</u>, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." <u>Id.</u>; <u>see</u> <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004), <u>cert.denied</u>, <u>Maddox v. Taylor</u>, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)."  <u>Miller-El v. Cockrell</u>, 537 U.S.

at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991);  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984). Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

### III.  Review of Petitioner's Claims.

The instant petition itself alleges the following as grounds for relief: (1) unduly suggestive photo lineup; (2) racial discrimination in jury selection; (3) insufficient evidence to convict Petitioner on conspiracy charge; (4) error in refusing to sever two "status offenses"; (5) improper admission of

statement by deceased victim; (6) improper preclusion of cross-examination of prosecution witness; (7) prosecutorial misconduct in closing argument; (8) denial of a jury trial on facts used to give consecutive sentences; and (9) ineffective assistance of trial counsel.

A. Photo Lineup

Petitioner first contends that he was denied his constitutional rights because the photo lineup was unduly suggestive.  This contention is without merit.

1. The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Lenix argues that an impermissibly suggestive pretrial photographic lineup that tainted Curtis's in-court identification of him as the perpetrator constituted a miscarriage of justice and a denial of his constitutional right to due process. The Attorney General argues that the lineup and the in-court identification were proper and that error, if any, was not prejudicial.

Immediately after the shooting, Curtis told the 911 operator that the person who shot his cousin "was a guy, I don't know his name, but I'd know him if I could see him." At the preliminary hearing, Curtis did not testify, but the officer who showed him the lineup-a standard "six-pack" of photographs-testified that Lenix was the person whom Curtis picked out of the lineup. He testified that Curtis "said that there was one person who looked like the subject who did the shooting. He would be more confident if he was able to see the person-the person that he identified actually in person to say, definitely, that was him or not." He testified that Curtis "knew everyone else in the lineup" and that although he "kind of said that [Lenix] looked like the person" he "would have been more sure with himself if he was able to see the person in person" since he "didn't basically want to point a finger at somebody who was innocent." He testified that Curtis told him he had heard about Lenix's gang monikers from other people.

At Lenix's first trial, Curtis testified that he first saw Lenix a week before the shooting, that he knew him not by his name but by his gang monikers, and that otherwise he did not know him at all. He testified that on the day after the shooting, when he picked Lenix out of the lineup, he said he could not be 100 percent sure because the photograph showed only the head area and that to be 100 percent sure he wanted to see "his size, his build, his height." He testified that the person who shot his cousin had a "deformed," "decayed," or "missing" tooth that "jumped out" at him. He testified that after Lenix stood up in court, opened his mouth, and showed his teeth he was "a hundred, hundred and fifty percent sure that this is the guy that murdered my cousin." He testified that he knew "one of the other guys" in the lineup and that he did not tell the officer he knew "all the other ones."

Lenix's second trial ended before Curtis could testify. Before his third trial, Lenix filed a motion in limine to preclude Curtis from identifying him in court as the perpetrator. At the hearing on the motion, his trial attorney argued that the lineup was impermissibly suggestive since Curtis could have learned about Lenix's tooth problem from anonymous third parties not available for cross-examination and since the officer testified Curtis told him he knew all of the other people in the lineup. The prosecutor acknowledged the officer's testimony but emphasized Curtis's testimony that he knew only one of the other people in the lineup and that "he noticed an abnormality with his teeth" the day before he picked Lenix out of the lineup. The court noted that Lenix would have "every opportunity to cross-examine [Curtis] on the basis of whatever information he has on which he bases that identification, including the potential suggestiveness of the photographic lineup," and denied the motion.

At Lenix's third trial, the prosecutor asked Curtis if he "more or less" identified Lenix on the day after the shooting, from among the six photographs in the lineup, as the person who shot Lamar. Curtis testified, "Yes." He testified that he was "quite sure" about his lineup identification but that since the photograph was just "a head shot" and could have been old, and since the person who shot his cousin had a "decayed," "missing," "chipped," or "defective" front tooth, he "wanted to see him" in person. After Lenix stood up in court, opened his mouth, and showed his teeth, Curtis testified he had "absolutely no doubts" and was "100 percent positive" that Lenix was the person who shot his cousin. The officer who showed him the lineup testified that Curtis not only identified Lenix as the person who looked like the shooter but also said "he wanted to see the person in person" to be positive about his identification due to the severity of a murder charge. The officer testified that Curtis told him he knew the names of the other five people in the lineup.

Here, as in <u>People v. Johnson</u> (1992) 3 Cal.4th 1183, all six photographs were of African-American males who were "generally of the same age, complexion, and build, and generally resembling each other," the accused's "photograph did not stand out, and the identification procedure was sufficiently neutral" to withstand appellate review. (<u>Id</u>. at pp. 1208, 1214, 1217; see <u>People v. Gordon</u> (1990) 50 Cal.3d 1223, 1243, disapproved on another ground by <u>People v. Edwards</u> (1991) 54 Cal.3d 787, 834-835.) Before trial, Curtis picked Lenix out of the lineup even though everyone's mouths were either barely open or completely closed and no details about anyone's teeth were visible. At trial, he positively identified Lenix after he stood up, opened his mouth, and showed his teeth.

An appellate court will set aside "convictions based on eyewitness identification at trial following a pretrial identification by photograph" only if the pretrial procedure "was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." (<u>Simmons v. United States</u> (1968) 390 U.S. 377, 384.) The standard of independent review applies to a trial court's ruling that a pretrial identification procedure was not impermissibly suggestive. (<u>People v. Kennedy</u> (2005) 36 Cal.4th 595, 608-609.) Our independent review of the record persuades us that Lenix fails to make the requisite showing for relief on appeal. (<u>See People v. Ochoa</u> (1998) 19 Cal.4th 353, 412.)

(LD 7, pp. 4-6).

        2. <u>Federal Standard</u>.

The Due Process Clause of the United States Constitution prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification." <u>Stovall v. Denno</u>, 388 U.S. 293, 302 (1967), overruled on other grounds by <u>Griffith v. Kentucky</u>, 479 U.S. 314, 326 (1987) (discussing retroactivity of rules propounded by Supreme Court). To determine the admissibility of identification testimony, courts employ a two-step analysis. <u>United States v. Love</u>, 746 F.2d 477, 478 (9th Cir.1984).

The first step focuses on whether the identification procedure was impermissibly suggestive. <u>Id</u>. (citing <u>Manson v. Brathwaite</u>, 432 U.S. 98, 107 (1977); <u>Neil v. Biggers</u>, 409 U.S. 188, 199-200 (1972)). A suggestive identification violates due process if it was unnecessary or "gratuitous" under the circumstances. <u>Biggers</u>, 409 U.S. at 198. An identification procedure is suggestive where it "[i]n

1   effect ... sa[ys] to the witness, 'This is the man.'"  <u>Foster v. California</u>, 394 U.S. 440, 443, 89 S.Ct.

2   1127 (1969).  One-on-one identifications are sometimes necessary because of officers' and suspects'

3   strong interest in the expeditious release of innocent persons and the reliability of identifications made

4   soon after and near a crime. <u>See, e.g., United States v. Kessler</u>, 692 F.2d 584, 585 (9th Cir.1982).

5         Each case must be considered on its own facts, and whether due process was violated depends

6   on the totality of the circumstances surrounding the confrontation.  <u>Simmons v. United States</u>, 390 U.S.

7   377, 383 (1968); <u>see also Stovall</u>, 388 U.S. at 302.  If the court finds that a challenged procedure is not

8   impermissibly suggestive, the due process inquiry ends. <u>United States v. Bagley</u>, 772 F.2d 482, 493

9   (9th Cir.1985) ("Having concluded that the ... show-up was a legitimate identification procedure, we

10  need not reach the question whether the [witness's] identification was reliable under the test enunciated

11  in <u>Biggers</u>.").

12        If the identification procedure was impermissibly suggestive, a reviewing court proceeds to the

13  second step and determines whether, under the totality of the circumstances, an identification that

14  resulted from it was nevertheless reliable.  <u>Biggers</u>, 409 U.S. at 198. Factors to be considered in

15  evaluating the reliability of an identification after a suggestive procedure include: (1) the opportunity of

16  the witness to view the criminal at the time of the crime; (2) the witness' degree of attention paid to the

17  criminal; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty

18  demonstrated by the witness at the time of the confrontation; and (5) the length of time between the

19  crime and the confrontation. <u>Id</u>. at 199–200; <u>Torres v. City of Los Angeles</u>, 548 F.3d 1197, 1209 (9th

20  Cir.2008).

21        If the flaws in the pretrial identification procedures are not so suggestive as to violate due

22  process, "the reliability of properly admitted eyewitness identification, like the credibility of the other

23  parts of the prosecution's case is a matter for the jury." <u>Foster v. California</u>, 394 U.S. at 443, n. 2; <u>see</u>

24  <u>also Manson</u>, 432 U.S. at 116 ("[j]uries are not so susceptible that they cannot measure intelligently the

25  weight of identification testimony that has some questionable feature").

26              3.  <u>Analysis</u>.

27        Here, Petitioner does not contend that that the other five photographs in the photo line-up were

28  not physically similar to Petitioner.  Rather, he contends that the lineup is tainted because the witness

knew the other five individuals in the lineup by name.

Indeed, even a cursory review of the photo lineup indicates that all six individuals in the lineup were young African-American males of approximately the same age, complexion, and hairstyle.  There is little, if anything, to distinguish them physically and none of the photographs, least of all Petitioner's, stands out as being different from the rest.  However, Petitioner does not premise his challenge on their physical dissimilarities of the individuals in the lineup.  Rather, he argues that the witness's knowledge of the other five individuals made the lineup unconstitutional.  The Court disagrees.

First, at trial, the officer who presented the witness with the lineup testified that he gave the witness the standard cautionary advisement prior to showing him the lineup.  That advisement indicated, inter alia, that the photos "may" depict a person who "may" be responsible for the crime being investigated.  (3 RT, p. 228).  Nowhere in the advisement was the witness told that a suspect was definitively included among the six photos.  Thus, based on the advisement, the mere fact that the witness knew the other five individuals in the lineup did not, through a process of elimination, automatically point to Petitioner as being the suspect.

Second, Petitioner has not cited, and the Court has not found, any controlling Ninth Circuit or Supreme Court authority that a lineup can be constitutionally tainted by virtue of a witness' level of knowledge, rather than by the manner in which the photos are presented to that witness.  In U.S. v. Wade, the Supreme Court, in passing, mentioned that a lineup could be unfair if "all in the lineup but the suspect were known to the identifying witness…."  Wade, 388 U.S. at 233.  In making that statement, the Court cited two cases, People v. James, 218 Cal.App.2d 166, 170-171 (1963), and People v. Boney, 28 Ill.2d 505 (1963).  Id.  In James, the photo lineup included individuals who were well-known public officials, e.g., a Deputy District Attorney, a Deputy Sheriff, and the County Clerk.  James, 218 Cal.App.2d at 171.  In Boney, the lineup consisted of the suspect in a home invasion robbery and rape along with four members of the State's Attorney's staff, all of whom were known to the identifying witness who himself was an investigator for the State's Attorney's office.  Boney, 28 Ill.2d at 507.  However, in both cases, the state court concluded that, despite the obvious concerns about the composition of the lineups, they were constitutional.

It takes little imagination to comprehend how including photographs of well-known individuals,

e.g., celebrities, movie stars, sports figures, etc., that are well-known to the general public, would tend to direct the eyewitness's attention to the photograph that is not of a well-known public figure.  By contrast, however, in this case none of the other five individuals included in the lineup were known as public officials or as any kind of public figures.  Rather, they simply appear to have been individuals whose photos were on file with the police department and whose physical characteristics closely mirrored those of Petitioner.  The fact that Bakersfield is a relatively small community and that African-American men of roughly the same age as Petitioner might tend to know each other is not, in itself, a basis for concluding that the lineup was unconstitutional.

Third, at Petitioner's first trial, Curtis, the identifying witness, testified that he had first seen Petitioner a week before the shooting and that he knew him by his gang monikers but that otherwise he did not know Petitioner at all.  Curtis indicated at the first trial that he knew all of the other individuals in the lineup, although he did not indicate how well he knew them.  Based on this testimony, even if true and uncontroverted, it is difficult to see how the Court could conclude that where an eyewitness has some unspecified acquaintance with five of the individuals in the lineup but only "some" knowledge, in the form of having seen an individual and having learned his gang monikers, of the suspect, makes the lineup "impermissibly suggestive."

Finally, the Court notes that Curtis was fairly certain of his initial identification of Petitioner from the lineup but was "100%" to "150%" certain after seeing Petitioner in court and observing his teeth, which were distinctive.  Considering all of the circumstances discussed above, it cannot be said that the photo lineup was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable harm." Simons v. United States, 390 U.S. 377, 384 (1968).  Thus, the state court's adjudication was not an unreasonable application of, clearly established law, and therefore Petitioner is not entitled to relief on this claim.

B.  Racial Discrimination In Jury Selection.

Petitioner next contends that the prosecutor struck the sole African American from the jury panel because of racial discrimination.  This contention is also without merit.

1.  The California Supreme Court's Decision.

The California Supreme Court rejected Petitioner's claim as follows:

Because the sole issue presented in this appeal concerns jury selection, we focus on that process. California trial judges have broad discretion over the specific manner in which voir dire is conducted (see Code Civ. Proc., § 223), and practices vary widely. In some courts 12 panelists are selected and questioned. If a panelist is excused for cause or by peremptory challenge, a new panelist is called. Other courts screen larger groups of prospective jurors. Some trial judges do a great deal of questioning, others very little. Some courts place time limits on counsel's questioning and either require or permit counsel to ask group questions. Practices vary in terms of which counsel questions panelists first and who exercises the first peremptory challenge. Advocates who pass an opportunity to challenge retain the option to challenge a seated panelist after an opponent exercises a challenge. The jury is not considered mutually accepted until both sides pass in succession or exhaust their challenges.

In this case, the court announced that it would select 13 jurors. At the end of the trial, one of the 13 would be selected by lot and designated as the alternate. The court conducted jury selection in the following manner. From the entire venire panel, a group of 21 panelists was called and questioned by the court and counsel. After panelists were excused for cause, the court designated 13 of the remaining panelists as the group subject to peremptory challenges. As a member of this group was challenged, his or her seat was filled by the panelist seated next in order until all members of the original group of 21 panelists were seated or excused. The court then called 21 new panelists and the process began again until both counsel accepted the panel by "passing," or exercising no more peremptory challenges.

After the first group of 21 panelists had been questioned, one juror was excused by the court and the prosecutor then passed for cause. The defense requested that five panelists be excused for cause; the court excused two. The prosecutor then used peremptory challenges against one White and two Hispanic panelists. Alternating with the prosecutor, defense counsel also exercised three peremptory challenges. At this point 12 panelists were seated in the jury box, including L.F., a Black man.

The clerk then called another 21 panelists whom the court and counsel questioned. Among this group was C.A., a Black woman. Defense counsel questioned C.A. first. In response to his questions, C.A. stated she did not know any of the names on the witnesses list. When asked whether anything about the nature of the case concerned her, C.A. stated "the murder aspect." Defense counsel then asked her if she understood that charges do not equate with guilt and that a determination of guilt must be based on evidence, to which C.A. replied yes. C.A. also stated that she could evaluate the credibility of witnesses and treat all witnesses the same.

The prosecutor subsequently asked C.A., "[Y]ou had indicated to [defense counsel] that you were particularly troubled by some of the charges, especially the murder charges; is that correct?" C.A. answered yes. The prosecutor then inquired, "I know anybody, of course, would be troubled by charges like that, but is there something—if I can ask—is there something beyond that." C.A. replied, "The fact that someone lost a life." The prosecutor then asked, "Have you yourself had anyone close to you involved in something like that?" C.A. answered that her sister's husband, to whom she was close, had been murdered 10 or 11 years ago. When asked if the murder was gang related, C.A. answered yes. The prosecutor asked which gang committed the offense. C.A. said the murder had occurred in Los Angeles County and no one had ever been arrested. Asked if she had "any trouble" with law enforcement for failing to make an arrest, C.A. said no. The prosecutor asked, "Was it one of those situations where basically nobody had an idea who did it?" C.A. said yes, and that she would not hold the experience against defendant. Asked whether there was anything else the parties needed to know about her brother-in-law's murder or any "similar situations," C.A. said no.

Later, the prosecutor asked the entire venire: "Has anybody here had any contacts with law enforcement that were hostile, confrontational, adverse, however you want to describe it, that might carry over into what we're going to do here in this courtroom? Anybody at all? Traffic ticket you didn't feel you deserved?" C.A. was the sole juror to reply and stated that she had

14

gotten a traffic ticket. When asked whether the officer was impolite "or anything like that," C.A. answered, "No. Well, no one ever feels they deserve a ticket. That was all." The prosecutor asked, "You feel that maybe he was a little shading the truth a little bit in it?" C.A. answered, "Yeah." The prosecutor then asked, "Did you feel you deserved it?" C.A. replied, "I didn't know if I deserved it or not, so I just went along with it."

The court on its own motion excused two panelists in the second group of 21. The prosecutor passed for cause and the court sustained one of defense counsel's two challenges for cause. A member of the second group was added to the 12 panelists remaining from the first group. The next peremptory challenge was with the prosecutor, who accepted the panel. Defense counsel exercised his fourth peremptory challenge against L.F., the Black panelist, and the prosecutor again accepted the panel. Defense counsel exercised his fifth peremptory challenge, and the prosecutor used his fourth peremptory challenge against a Hispanic panelist. Defense counsel then made a <u>Wheeler</u> motion, which the court reserved until the completion of voir dire.

C.A. was then one of the designated 13 panelists subject to peremptory challenge. After defense counsel exercised his sixth peremptory challenge, the prosecutor struck C.A. Defense counsel exercised a seventh peremptory challenge, and both sides accepted the panel. Both sides left unused a substantial number of their allotted peremptory challenges.

The jury was composed of six Caucasians, four Hispanics, and two Filipinos. No Blacks served as jurors or alternates. The record contains no information on whether any Blacks other than C.A. and L.F. participated in the venire.

At the <u>Wheeler/Batson</u> hearing, defense counsel pointed out that the prosecutor had excluded three Hispanics and one Black, and claimed the prosecutor "was excluding minorities from the jury, particularly Hispanics." As to the three Hispanic panelists, the prosecutor provided reasons which are not in dispute here.

Regarding C.A., the prosecutor stated that his memory was clearer as to later prospective jurors, but stated, "I was particularly concerned about her statement about the traffic ticket. When I was asking about uncomfortable run-ins with the police, she was actually the only juror who raised her hand. She indicated it was a traffic ticket, but then seemed to indicate that it wasn't adversarial and said that she didn't know the officer was lying, and just kind of didn't fight it because she wanted to take his word for it. Quite honestly, your Honor, I thought there was probably a lot more to it than that, and I felt uncomfortable with her because of that. [¶] I was also somewhat concerned with the fact that her brother [sic] was involved in a gang-related homicide, because it's been my experience more often than not that people who are themselves victims of gangs, not always by any means, but quite often are themselves gang members, and I was concerned with any kind of negative repercussions my case might have in that regard, as well."

Defense counsel did not respond. Addressing all four peremptory challenges, the court stated: "Based on the representations that I have from [the prosecutor] ... I do not find those challenges to be motivated because of the fact that any of the jurors excused were members of a minority group but rather for other reasons not motivated by any kind of ethnicity or membership in any particular minority group, so I'm going to deny the <u>Wheeler</u> motion."

On appeal, defendant limited his <u>Wheeler/Batson</u> claim to the challenge of C.A., the Black panelist, arguing the prosecutor's stated reasons were pretextual. The Court of Appeal rejected his argument, observing that the prosecutor's reasons for his challenge were "comprehensible, neither discriminatory nor implausible, and at variance with nothing in the record."

In an "ancillary argument," defendant asserted that the <u>Miller–El</u> cases impose a duty on reviewing courts to conduct comparative juror analysis to evaluate the credibility of the prosecutor's reasons for excusing minority prospective jurors. Defendant claimed this duty

15

applies even when a comparative juror analysis was neither requested by defense trial counsel nor otherwise performed by the trial court. The Court of Appeal rejected defendant's argument. Relying on <u>People v. Johnson</u> (2003) 30 Cal.4th 1302, 1 Cal.Rptr.3d 1, 71 P.3d 270, overruled on other grounds in <u>Johnson v. California</u> (2005) 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129, the Court of Appeal concluded that comparative juror analysis for the first time on appeal is not constitutionally compelled.

…

Defendant argues that the prosecutor's proffered explanations for exercising a peremptory challenge against C.A. were pretexts designed to disguise racial prejudice. The trial court found to the contrary. That finding is reasonable and supported by substantial evidence.

The prosecutor's first stated reason for challenging C.A. was her reaction to receiving a traffic ticket. When the prosecutor asked whether any of the prospective jurors ever had a "hostile, confrontational, [or] adverse" contact with law enforcement, C.A. was the lone juror who raised her hand. In response to the prosecutor's question as to whether C.A. felt the officer was impolite, C.A. said, "Well, no one ever feels they deserve a ticket." She replied "yeah" when the prosecutor asked whether C.A. felt the officer "was shading the truth a little bit." When asked whether she felt she deserved the ticket, C.A. said, "I didn't know if I deserved [the ticket] or not, so I just went along with it."

In explaining his challenge, the prosecutor stated that while C.A. did not depict the incident as adversarial and "wanted to take the officer's word for it," he felt "there was probably a lot more to it than that."

By raising her hand to answer the prosecutor's question, C.A. necessarily identified the experience as negative. C.A. stated her belief that the officer had not been entirely truthful during the incident. "We have repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement." (<u>People v. Turner, supra</u>, 8 Cal.4th at p. 171, 32 Cal.Rptr.2d 762, 878 P.2d 521; <u>People v. Panah</u> (2005) 35 Cal.4th 395, 442, 25 Cal.Rptr.3d 672, 107 P.3d 790.) Moreover, C.A.'s answers could be fairly characterized as equivocal, supporting the prosecution's inference that C.A. was not completely forthcoming about the incident and may have harbored some resentment. Even though defendant characterizes C.A.'s answers as showing her respect for law enforcement by giving the officer the benefit of the doubt, possible contrary inferences do not undermine the genuineness of the prosecutor's explanation.

As to the prosecutor's second reason for excusing C.A., he noted that her "brother" had been killed 10 or 11 years earlier in a gang-related murder. The prosecutor stated that it was his experience that "victims of gangs, not always by any means, but quite often are themselves gang members," and so he was concerned about "negative repercussions" for defendant's case.

Defendant complains that the prosecutor never confirmed that C.A.'s brother-in-law was a gang member, or explained how such an association would affect C.A.'s performance as a juror. However, the prosecutor was entitled to rely on this concern. Gang affiliation was at issue in the trial. Defendant was charged with a violation of carrying a loaded firearm in public while an active member of a criminal street gang (§ 12031, subd. (a)(2)(C)), and the venire panel was advised that "there's going to be some gang evidence." As the Court of Appeal stated: "The prosecutor's concern about possible 'negative repercussions' of the gang-related homicide in C.A.'s family arose from his own experience that victims of gangs tend to be members of gangs. Like his trepidation about her negative experience with law enforcement, his wariness about a possible family gang connection was comprehensible, neither discriminatory nor implausible, and at variance with nothing in the record." An advocate is permitted to rely on his or her own experiences and to draw conclusions from them. We have recognized that even hunches and idiosyncratic reasons may support a peremptory challenge. (<u>People v. Turner, supra</u>, 8 Cal.4th at p. 165, 32 Cal.Rptr.2d 762, 878 P.2d 521.) As noted

above, the question is not whether a different advocate would have assessed the risk differently, but whether this advocate was acting in a constitutionally prohibited way.

Additionally, defendant argues that the timing of the prosecutor's challenge to excuse C.A. is "suspicious" because it followed the striking of Black panelist L.F. by defense counsel, thereby resulting in no Blacks serving on the jury. However, the prosecutor had accepted the panel when it contained L.F. At the Wheeler/Batson hearing, the prosecutor advised that "he would have been fine" with L.F. on the jury. The prosecutor's representation finds support in the record. L.F. stated in voir dire that he is a boyhood friend of the one of the officers listed as a witness in the case, and played sports with Curtis Rufus, the victim of the attempted murder. The prosecutor's acceptance of the panel containing a Black juror strongly suggests that race was not a motive in his challenge of C.A. (People v. Kelly (2007) 42 Cal.4th 763, 780, 68 Cal.Rptr.3d 531, 171 P.3d 548; People v. Cornwell (2005) 37 Cal.4th 50, 69–70, 33 Cal.Rptr.3d 1, 117 P.3d 622.)

An analysis of the record demonstrates that substantial evidence supports the trial court's finding that the prosecutor's proffered reasons were not pretextual. Defendant's reliance on comparative juror analysis does not undermine this conclusion. The Court of Appeal, relying on our practice enunciated in People v. Johnson, supra, 30 Cal.4th at page 1322, 1 Cal.Rptr.3d 1, 71 P.3d 270, declined defendant's request to conduct a comparative juror analysis. Consistent with our conclusion regarding the effect of Miller–El II, supra, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196, and Snyder, supra, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175, we undertake that comparison here. It does not demonstrate purposeful discrimination.

Defendant compares C.A. to Juror No. 482753, one of the four Hispanics seated on the jury. Juror No. 482753 described an incident two years earlier in which he and his brother took away their mother's car keys because she had been drinking and wanted to drive. The juror explained that his mother called the police, who responded and "saw that my mother was drunk, so they assumed we had been drinking." The officers told the juror and his brother to return the keys, but they refused. The brother stepped forward and explained that they were not trying to cause problems. One of the officers pulled out his club and told the brothers they would be sprayed with Mace if they did not return the keys. The juror said there were two or three officers present and he thought the police "were getting a little too crazy." When the court inquired of his present feelings about the incident, the juror responded, "I was about ready to write a letter to the editor. I could have smeared them pretty bad, but I chose not to do it." The juror explained, "I figured they're trying ... to handle that situation without getting hurt." The juror told the court he could set aside the incident and not allow it to impact his deliberation in defendant's case.

Defendant complains that Juror No. 482753's dissatisfaction with the police concerning this incident is far more significant than C.A.'s comments about getting a traffic ticket. However, the prosecutor's hesitation regarding C.A. was based on his sense of her possible lingering resentment. On the other hand, Juror No. 482753 stated that he realized that the police were acting out of concern for their safety and so he did not complain about their conduct. Contrary to defendant's assertion, these two panelists were not similarly situated on this issue.

Juror No. 482753 also stated that his cousin shot and killed someone when he was 16 years old. The cousin was convicted and "had to go to jail," but "[h]e's out now, and he's doing great." The juror stated that his cousin was treated fairly by the police and courts, and "it was a bad situation, but it turned out to be a good situation for him." Defendant argues that the prosecutor apparently was not concerned that Juror No. 482753's cousin might be a gang member because he never asked about gang status. But in light of the juror's comments about his cousin's past experience and present circumstances, the prosecutor could have found such question unnecessary.

Further, Juror No. 482753 stated that he was a high school acquaintance of one of the police

officers identified as a potential witness in defendant's case. The juror described the officer as "a really good guy." This factor would likely have been significant in the prosecutor's decision to retain the juror and further distinguishes this juror from C.A. The prosecution's acceptance of this juror demonstrates another aspect of jury selection. While an advocate may be concerned about a particular answer, another answer may provide a reason to have greater confidence in the overall thinking and experience of the panelist. Advocates do not evaluate panelists based on a single answer. Likewise, reviewing courts should not do so.

Defendant attempts to compare C.A. with panelist E.T., who was in the second group of 21 panelists questioned. During questioning of panelists by the court, E.T. stated that his son was "accused of being a gang member, and he was exonerated." Defendant argues that despite this information, the prosecutor apparently did not have the same concerns about E.T. that he had about C.A. Defendant's argument is speculative. E.T. was never designated as one of the 13 prospective jurors subject to peremptory strikes, and thus we have no idea whether the prosecutor would have kept or challenged E.T. This aspect of review compares panelists who were struck with those who were allowed to serve or were passed by the prosecution before being ultimately struck by the defense. (See Miller–El II, supra, 545 U.S. at pp. 241 & 245, fn. 4, 125 S.Ct. 2317.)

Finally, we note that in examining the entire record, there is no other evidence that the prosecution's challenges were improperly based on race. There is no indication that the prosecutor or his office relied on racial factors. There is no evidence of procedural manipulation, deceptive questioning, or any of the other signs of constitutional violation like those present in Miller–El II. Based on the totality of the evidence, the prosecutor's stated reasons for excusing C.A. are fully supported. Defendant has failed to demonstrate those reasons were not genuine.

People v. Lenix, 44 Cal.4th 602, 608-611, 628-631.

## 2. Federal Standard.

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. See Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1985); Johnson v. California, 545 U.S. 162, 125 S.Ct. 2410 (2005). Batson claims are evaluated pursuant to a three-step test:

First, the movant must make a prima facie showing that the prosecution has engaged in the discriminatory use of a peremptory challenge by demonstrating that the circumstances raise "an inference that the prosecutor used [the challenge] to exclude veniremen from the petit jury on account of their race." Second, if the trial court determines a prima facie case has been established, the burden shifts to the prosecution to articulate a [gender]-neutral explanation for challenging the juror in question. Third, if the prosecution provides such an explanation, the trial court must then rule whether the movant has carried his or her burden of proving the existence of purposeful discrimination.

Tolbert v. Page, 182 F.3d 677, 680 (9th Cir.1999) (en banc) (internal citations omitted).

In order to establish a prima facie case of racial discrimination, petitioner must show that "(1) the prospective juror is a member of a 'cognizable racial group,' (2) the prosecutor used a peremptory

18

strike to remove the juror, and (3) the totality of the circumstances raises an inference that the strike was motived by race." Boyd v. Newland, 467 F.3d 1139, 1143 (9th Cir.2006) (citing Batson, 476 U.S. at 96, and Cooperwood v. Cambra, 245 F.3d 1042, 1045–46 (9th Cir.2001)).  A prima facie case of discrimination "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.'" Johnson, 545 U.S. at 169 (quoting Batson, 476 U.S. at 94.)  In evaluating whether a defendant has established a prima facie case, a reviewing court should consider the "'totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike." Boyd, 467 F.3d at 1146 (quoting Batson, 476 U.S. at 94, 96). This evaluation should include a review of the entire transcript of jury voir dire in order to conduct a comparative analysis of the jurors who were stricken and the jurors who were allowed to remain. Boyd, 467 F.3d at 1050 ("We believe, however, that Supreme Court precedent requires a comparative juror analysis even when the trial court has concluded that the defendant failed to make a prima facie case"); see also Miller–El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (utilizing comparative analysis, in a case in which a prima facie showing had been made, to determine whether the prosecutor had been motived by racial bias in exercising peremptory challenges).

        At the second step of the Batson analysis, "'the issue is the facial validity of the prosecutor's explanation." Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). "A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror." Id. at 360. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral." Stubbs v. Gomez, 189 F.3d 1099, 1105 (9th Cir.1999) (quoting Hernandez, 500 U.S. at 360). For purposes of step two, the prosecutor's explanation need not be "persuasive, or even plausible." Purkett v. Elem, 514 U.S. 765, 768 (1995). Indeed, "[t]o accept a prosecutor's stated nonracial reasons, the court need not agree with them." Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir.2006). "It is not until the third step that the persuasiveness of the justification becomes relevant-the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." Purkett, 514 U.S. at 768. The question is whether, after an evaluation of the record pertaining to that particular case, the prosecutor's race-neutral explanation for a peremptory challenge should be believed. Id

1        In the third step of a <u>Batson</u> challenge, the trial court has "the duty to determine whether the

2 defendant has established purposeful discrimination," <u>Batson,</u> 476 U.S. at 98, and, to that end, must

3 evaluate the "persuasiveness" of the prosecutor's proffered reasons. <u>See Purkett</u>, 514 U.S. at 768. In

4 determining whether petitioner has carried this burden, the Supreme Court has stated that "a court must

5 undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be

6 available.'" <u>Batson</u>, 476 U.S. at 93 (quoting <u>Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S.

7 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)); <u>see also Hernandez</u>, 500 U.S. at 363. "[I]mplausible or

8 fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."

9 <u>Purkett</u>, 514 U.S. at 768; <u>see also Lewis v. Lewis</u>, 321 F.3d 824, 830 (9th Cir.2003) ("[I]f a review of

10 the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons

11 may be deemed a pretext for racial discrimination.")  In step three, the court "considers all the evidence

12 to determine whether the actual reason for the strike violated the defendant's equal protection rights."

13 <u>Yee v. Duncan</u>, 463 F.3d 893, 899 (9th Cir.2006). A reviewing court must evaluate the "totality of the

14 relevant facts" to decide "whether counsel's race-neutral explanation for a peremptory challenge should

15 be believed." <u>Ali v. Hickman</u>, 584 F.3d 1174, 1180 (9th Cir.2009). "A court need not find all nonracial

16 reasons pretextual in order to find racial discrimination." <u>Kesser</u>, 465 F.3d at 360.

17        Petitioner bears the burden of persuasion to prove the existence of unlawful discrimination.

18 <u>Batson</u>, 476 U.S. at 93. This "ultimate burden of persuasion ... rests with, and never shifts from, the

19 opponent of the strike." <u>Purkett</u>, 514 U.S. at 768.  However, "the defendant is entitled to rely on the

20 fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice

21 that permits 'those to discriminate who are of a mind to discriminate.'" <u>Batson</u>, 476 U.S. at 96 (quoting

22 <u>Avery v. Georgia</u>, 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953)).

23        Within this legal framework, it must also be kept in mind that this Court must be doubly

24 deferential to the state court's findings on this issue.  Under § 2254(d)(2), this Court must defer to the

25 California court's conclusion that there was no discrimination unless that conclusion "was based on an

26 unreasonable determination of the facts in light of the evidence presented in the State court

27 proceeding."   Additionally, unless the state appellate court was objectively unreasonable in concluding

28 that a trial court's credibility determination was supported by substantial evidence, it must be upheld on

1   habeas review. See Rice v. Collins, 546 U.S. 333, 338–42, 126 S.Ct. 969 (2006); see id. at 341–42, 126

2   S.Ct. 969 ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility,

3   but on habeas review that does not suffice to supersede the trial court's credibility determination.").

4                    3. Analysis.

5           The California Supreme Court exhaustively analyzed this issue before concluding that no

6   Batson error occurred. Since the state court applied the correct standard, the only issue is whether its

7   application of Batson was objectively unreasonable. The Court concludes that it was not.

8           As Respondent correctly observed, the state court examined each reason articulated by the

9   prosecutor for striking prospective juror C.A. When the prosecutor asked if anyone of the prospective

10  jurors had experienced a "hostile, confrontational, [or] adverse" contact with law enforcement, C.A.

11  was the only one to raise her hand, thus indicating that, in her view, the experience was negative. C.A.

12  elaborated that she felt the officer had not been entirely truthful during the incident and that she had

13  gone along with the ticket even though she was not sure she deserved it. The prosecutor indicated that

14  he felt there was more to the incident than C.A. had indicated and that some residual hostility might

15  still exist. The issue here is not whether the prosecutor was "correct" in his assessment of C.A., but

16  whether he asserted a race-neutral explanation for the challenge or whether such a reason appears to be

17  a pretext for racial discrimination. The foregoing establishes a sufficient race-neutral basis under

18  Batson to accept the prosecution's reason for dismissing the prospective juror. E.g., Cook v. LaMarque,

19  593 F.3d 510, 520 (9th Cir. 2010); Mitleider v. Hall, 391 F.3d 1039, 1048-1049 (9th Cir. 2004)(previous

20  negative experience with law enforcement sufficient race-neutral basis for striking prospective juror);

21  United States v. Newhouse, 484 Fed. Appx. 181, 183-184 (9th Cir. 2009)(same); United States v.

22  Brown, 560 F.3d 754, 763 (8th Cir. 2009)(same).

23          The prosecutor also indicated that he was concerned because C.A.'s brother had been killed

24  years earlier in a gang-related murder when the trial itself would involve charges that Petitioner

25  possessed a firearm while an active member of a criminal street gang. Again, no litmus test exists to

26  assess the truth or falsity of the prosecution's reasons after the fact; however, based on this record, such

27  concerns as those expressed above are not unreasonable and are race-neutral. See, e.g., United States v.

28  Stinson, 647 F.3d 1196, 1207 (9th Cir.2011) (finding that prosecutor properly struck juror who had

21

"personal familiarity with gangs"), cert. denied, ––– U.S. –––, 132 S.Ct. 1768, 182 L.Ed.2d 551 (2012); Rodriguez v. Biter, 2013 WL 2351291, at *14 (C.D.Cal. May 16, 2013)(familiarity with local gangs sufficient race-neutral basis for striking prospective juror); Wilson v. Harrington, 2011 WL 7174058, at *4–6 (C.D.Cal. Nov.9, 2011) (finding that prosecutor properly struck prospective juror who learned about petitioner's gang through her husband, who coached at a school located in an area frequented by the gang, even where she did not actually say she knew or was familiar with any gang members); Vincente v. McDonald, 2011 WL 2971195, at *6–7 (E.D.Cal. July 19, 2011) (finding that prosecutor properly struck prospective juror who stated he was familiar with gangs and grew up in an area with gangs, including the defendant's gang, because it was reasonable for the prosecutor to fear that the prospective juror might bring his outside knowledge of gangs and their practices into the jury room).

Petitioner, for his part, raises four arguments in rebuttal.  First, Petitioner contends that C.A.'s comments did not even "hint" at bias or resentment toward the police.  (Doc. 1, pp. 15-16).  However, the court considered this argument and found the prosecutor's suspicion that C.A. might harbor lingering resentment to be race-neutral.  Without more, this Court is not in a position to second-guess the California Supreme Court.

It is widely acknowledged that the trial judge is in the best position to evaluate the credibility of the prosecutor's proffered justifications. See e.g., Rice, 546 U.S. at 343, 126 S.Ct. 969 (Breyer J. concurring) ("[T]he trial judge is best placed to determine whether, in a borderline case, a prosecutor's hesitation or contradiction reflect (a) deception, or (b) the difficulty of providing a rational reason for an instinctive decision."); Hernandez v. New York, 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) ("As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." (internal quotation marks and citation omitted)). Given that the trial court had the benefit of viewing both the juror questionnaires and the prospective jurors who answered them when making a determination under Batson, given that inherent subjectivity of the prosecutor's proffered grounds, i.e., that he "felt" that C.A. had lingering resentment toward police, and given that both the California Court of Appeal and the California Supreme Court presumably had those same questionnaires available to review on appeal, this Court must defer to the state courts' credibility and factual findings. See Rice, 546 U.S. at 338-39, 126 S.Ct.

22

1   969 ("[A] federal habeas court can only grant Collins' petition if it was unreasonable to credit the

2   prosecutor's race-neutral explanations for the Batson challenge. State-court factual findings, moreover,

3   are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and

4   convincing evidence.'") (quoting Miller–El v. Dretke, 545 U.S. 231,  240, 125 S.Ct. 2317 (2005)).

5          Second, Petitioner argues that the timing of the strike was suspicious occurring as it did

6   immediately after defense counsel struck the only other African-American from the jury panel.  (Doc.

7   1, p. 16).  In that regard, the prosecutor stated that he had been prepared to keep the juror stricken by

8   the defense, a claim the court found credible based on that prospective juror's pro-prosecution qualities.

9          Next, Petitioner argues that, comparing C.A.'s remarks during voir dire to those of a Hispanic

10  prospective juror, Juror 482753, which, Petitioner maintains, are virtually identical regarding negative

11  police experiences, shows that the prosecutor's reasons for striking C.A. were pretextual since the

12  prosecution did not strike Juror 482753.  (Doc. 1, p. 17).  The California Supreme Court, however,

13  concluded that the two individuals' experiences were not similar.  C.A., according to the prosecutor,

14  had lingering resentment toward the police for what she felt was an undeserved ticket, while Juror

15  482753, had an altercation with police when he and his brother took his intoxicated mother's car keys

16  and refused to give them to police.  However, in that case, Juror 482753 told the prosecutor that he

17  chose not to write to the newspapers about what he felt was overreaction by police since he "figured

18  they're trying…to handle that situation without getting hurt."  Such marked differences between the

19  two cases support the state court's conclusion that the two instances were not "similarly situated" for

20  purposes of a Batson analysis.

21         Finally, Petitioner argues that a comparison of C.A. with three other jurors who were not

22  stricken by the State shows a discriminatory intent by the prosecution.  Respondent notes that the first

23  individual, Mr. Tamsi, was never put in the jury box and thus the prosecution never had an opportunity

24  to strike him with a peremptory challenge. (Doc. 36, p. 46). The other two, Ms. Helfer and Ms. Montes,

25  were excused for cause.  Since a comparative juror analysis should compare only those jurors who were

26  struck by the prosecution with those who were allowed to serve or were passed by the prosecution

27  before being struck by the defense, Miller-El v. Dretke, 545 U.S. 231, 241, 245, n. 5, 125 S.Ct. 2317

28  (2005), and since none of the three potential jurors referenced by Petitioner meet those precise

specifications, any comparison is irrelevant to a <u>Batson</u> analysis.  Accordingly, the state court's

adjudication of this issue was not objectively unreasonable.  Hence, the claim should be rejected.

     C.   <u>Insufficiency Of The Evidence To Support Conspiracy Count</u>

    Petitioner also contends that insufficient evidence was presented regarding his conspiracy

conviction.  This contention too is without merit.

     1.   <u>The 5th DCA's Opinion.</u>

The 5th DCA rejected Petitioner's claim as follows:

Lenix argues insufficiency of the evidence of conspiracy to murder. The Attorney General
argues sufficiency of the evidence.

Our role in a challenge to the sufficiency of the evidence in a criminal case is limited to
determining whether, on the entire record, viewing the evidence in the light most favorable to
the prosecution and presuming in support of the judgment every fact reasonably inferable from
the evidence, a rational trier of fact could find the accused guilty beyond a reasonable doubt.
(<u>People v. Ochoa</u> (1993) 6 Cal.4th 1199, 1206.) The "critical inquiry" is "to determine whether
the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."
(<u>Jackson v. Virginia</u> (1979) 443 U.S. 307, 318; U.S. Const., 14th Amend.)  Our duty is to
"'view the evidence in a light most favorable to [the prosecution] and presume in support of
the judgment the existence of every fact the trier could reasonably deduce from the evidence.'
"(<u>People v. Johnson</u> (1980) 26 Cal.3d 557, 576; Cal. Const., art. I, § 15.)

Lenix's insufficiency of the evidence argument has two facets-one as to the evidence that he
entered into an agreement with Deshonta Grayson or Glen Maurice Johnson to commit a
murder, the other as to the evidence that he, Grayson, or Johnson committed an overt act in
furtherance of the conspiracy. We will address each individually.

With reference to Lenix's argument about the evidence that he entered into an agreement with
Grayson or Johnson to commit a murder, Curtis testified that after he and Lamar encountered
Lenix and Johnson in the alley shortly before the shooting he heard something hit the ground
and saw Lenix pick up something he put into his waistband. Videotape from a convenience
store security camera showed Lenix bend over and pick up something he put into his waistband
after he and Johnson encountered Curtis and Lamar in the alley. Curtis testified he and Lamar
got into and started up their cars when the videotape showed Johnson and Lenix approach a car
in the alley, lean over at the passenger window for a few moments, and then walk down the
alley.

Later videotape showed Grayson by himself, then Johnson and Lenix together, walk through
the alley and out of camera range and, shortly afterward, Lenix walk by himself toward a car
Curtis testified Johnson was driving. Curtis testified that Grayson then walked over to Lamar's
car, opened the door of the car, and said something to Lamar, that he and Lamar both got out of
their cars, and that he told Lamar, "Never mind what this guy is talking about. Let's leave now.
Let's go." Curtis testified he drove away after Lamar told him "someone had a gun" but when
he looked back he saw Lenix walk up to Lamar "from the right blind side, kind of diagonal,"
raise a gun, and shoot him in the head. Curtis testified Grayson and Lenix started to walk away
together but then Grayson ran toward him, Lenix fired shots at him, striking Grayson, and got
into Johnson's car, which Johnson drove away.

A conviction of conspiracy requires proof that the accused and another person had the specific
intent to agree or conspire to commit a crime, as well as the specific intent to commit the

elements of that crime, together with proof of the commission of an overt act by one or more of the parties to that agreement in furtherance of the conspiracy. (People v. Morante (1999) 20 Cal .4th 403, 416.)The intent to agree to commit the crime, which is the essential element of conspiracy, may be, and from the secrecy of the crime usually must be, established by circumstantial evidence. (People v. Austin (1994) 23 Cal.App.4th 1596, 1606, disapproved on another ground by People v. Palmer (2001) 24 Cal.4th 856, 860-861, 867.) Direct evidence of a meeting among conspirators or of words conspirators spoke is not necessary, as inferences from circumstantial evidence like the conduct of conspirators in carrying out a crime together are adequate to show the agreement necessary for a conspiracy. (People v. Consuegra (1994) 26 Cal.App.4th 1726, 1734; People v. Ordonez (1991) 226 Cal.App.3d 1207, 1232.)A sufficiency of the evidence that Lenix entered into an agreement with Grayson and Johnson to commit a murder is in the record.

With reference to Lenix's argument about the evidence that he, Grayson, or Johnson committed an overt act in furtherance of the conspiracy, the Attorney General acknowledges with commendable candor that of the 12 overt acts the jury found true eight "do not appear to have been committed in furtherance of the conspiracy because they either preceded the agreement, constituted the underlying crimes themselves, or occurred after the underlying crimes were committed." We agree. Since a conspiracy conviction can rest on a single overt act (People v. Russo (2001) 25 Cal.4th 1124, 1131-1136; People v. Alleyne (2000) 82 Cal.App.4th 1256, 1260), the question before us is whether a sufficiency of the evidence of any one of the other four overt acts is in the record.

The record answers that question in the affirmative. In overt act number six, the jury found that coconspirators Lenix and Johnson conferred briefly and then separated, Lenix walking toward Lamar and Johnson walking toward the car. Moments later, as Curtis testified, Lenix shot Lamar. Immediately afterward, as Curtis testified, Johnson drove up in the getaway car. The jury could and-as, the true finding on overt act number six shows, did-make the inference from circumstantial evidence that Lenix and Johnson talked for a short time to fine-tune the last-minute details of the conspiracy to murder, after which Lenix walked in one direction toward Lamar to shoot him while Johnson walked in another direction to drive the getaway car. Since overt act six was "'an outward act done in pursuance of the crime and in manifestation of an intent or design, looking toward the accomplishment of the crime'" (People v. Zamora (1976) 18 Cal.3d 538, 549, fn. 8, quoting Chavez v. United States (9th Cir.1960) 275 F.2d 813, 817), a sufficiency of the evidence that Lenix and Johnson committed an overt act in furtherance of the conspiracy is in the record.

(LD 7, pp. 15-18).

        2.  Federal Standard.

    The law on sufficiency of the evidence is clearly established by the United States Supreme

Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307,

the test on habeas review to determine whether a factual finding is fairly supported by the record is as

follows: "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).  Thus, only if "no

rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be

1   entitled to habeas relief.  Jackson, 443 U.S. at 324.   Sufficiency claims are judged by the elements

2   defined by state law.  Id. at 324, n. 16.

3       A federal court reviewing collaterally a state court conviction does not determine whether it is

4   satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335,

5   338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the

6   light most favorable to the prosecution, any rational trier of fact could have found the essential

7   elements of the crimes beyond a reasonable doubt.'"  See id., quoting Jackson, 443 U.S. at 319.  Only

8   where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ

9   be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

10      If confronted by a record that supports conflicting inferences, a federal habeas court "must

11  presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such

12  conflicts in favor of the prosecution, and must defer to that resolution."  Jackson, 443 U.S. at 326.  A

13  jury's credibility determinations are therefore entitled to near-total deference.  Bruce v. Terhune, 376

14  F.3d 950, 957 (9th Cir. 2004).  Except in the most exceptional of circumstances, Jackson does not

15  permit a federal court to revisit credibility determinations.  See id. at 957-958.

16      Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

17  conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).  However, mere suspicion and

18  speculation cannot support logical inferences.  Id.; see, e.g., Juan H. v. Allen, 408 F.3d 1262, 1278-79

19  (9th Cir. 2005)(only speculation supported conviction for first degree murder under theory of aiding

20  and abetting).

21      After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson

22  with an additional layer of deference.  Juan H., 408 F.3d at 1274.  Generally, a federal habeas court

23  must ask whether the operative state court decision reflected an unreasonable application of Jackson

24  and Winship to the facts of the case.  Id. at 1275.[3]

25      Moreover, in applying the AEDPA's deferential standard of review, this Court must also

26  presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v.

27

28  [3]  Prior to Juan H., the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims.  See Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004); Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir. 2005).

_Wilson_, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986).  This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts.  _Tinsley v. Borg_, 895 F.2d 520, 525 (9th Cir.1990).  Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption.  _Sumner v. Mata_, 455 U.S. 539, 597, 102 S.Ct. 1198 (1981).

In _Cavazos, v. Smith_, __U.S. __, 132 S.Ct. 2 (2011), the Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that _Jackson_

> "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." _Renico v. Lett_, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).

> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

_Cavazos_, 132 S.Ct. at 3.

> "_Jackson_ says that evidence is sufficient to support a conviction so long as 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'  443 U.S., at 319, 99 S.Ct. 2781.  It also unambiguously instructs that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." _Id._, at 326, 99 S.Ct. 2781.

_Cavazos_, 132 S.Ct. at 6.

3. _Analysis._

As a preliminary matter, the Court notes that the 5th DCA expressly cites _Jackson_ in denying this claim.  Accordingly, the state court applied the correct legal standard, and this Court's only task is to determine whether the state court adjudication was contrary to or an unreasonable application of that standard; it was not.

As the state court noted, under California law, a conviction for conspiracy requires proof that the accused and another person had the specific intent to agree or conspire to commit a crime, as well

1   as the specific intent to commit the elements of that crime, together with proof of the commission of

2   an overt act by one or more of the parties to that agreement in furtherance of the conspiracy. The

3   "intent to agree" may be inferred from circumstantial evidence.

4          At trial, the jury found true twelve specific "overt acts" committed by Petitioner in furtherance

5   of the conspiracy.  However, Respondent conceded, and the 5th DCA accepted as true for the sake of

6   argument, that eight of the twelve "overt acts" did not qualify for a conspiracy conviction under

7   California law.  However, the 5th DCA concluded that one overt act, i.e., number six, did qualify and

8   was supported by sufficient evidence.  That overt act was that Petitioner and Johnson conferred briefly

9   and then separated, with Petitioner walking toward one victim while Johnson walked toward the

10  getaway car, immediately before Petitioner shot the victim.  As the state court observed:

11          "The jury could—and, as the true finding on overt act number six shows, did—make the
            inference from circumstantial evidence that [Petitioner] and Johnson talked for a short time to
12          fine-tune the last-minute details of the conspiracy to murder, after which [Petitioner] walked in
            one direction toward Lamar to shoot him while Johnson walked in another direction to drive
13          the getaway car."

14  The state court concluded that this circumstantial evidence was sufficient to show that Petitioner and

15  his co-conspirator committed an "overt act in furtherance of the conspiracy."  Nothing in the record

16  disputes this conclusion and nothing in the petition offers any reason why such a conclusion would be

17  objectively unreasonable.  As Respondent correctly points out, Petitioner's argument that there was no

18  evidence at trial that Petitioner and Johnson had any reason to kill the victim is undermined by the fact

19  that California law does not include motive as an element of a criminal conspiracy.  See People v.

20  Hillhouse, 27 Cal.4th 469, 503-504 (2002).  Accordingly, this claim should be rejected.

21          D.  Denial Of Severance Motion.

22          Petitioner next contends that the trial court erred in refusing to sever two "status offenses" in

23  counts four and five. This contention is without merit.

24              1.  The 5th DCA's Opinion.

25  The 5th DCA rejected Petitioner's claim as follows:

26  Lenix argues that joint trial of the status offenses (the count 4 possession of a firearm by a
    convicted felon and the count 5 possession of a loaded firearm in a public place by an active
27  participant in a criminal street gang) with the substantive offenses (the count 1 first degree
    murder, the count 2 attempted murder, and the count 3 conspiracy to commit murder)
28  constituted a miscarriage of justice and a denial of his constitutional right to due process. The
    Attorney General argues that Lenix forfeited his right to appellate review, that a joint trial was

proper, and that error, if any, was not prejudicial.

Preliminarily, we address the Attorney General's forfeiture argument. With reference to count 4, appellant's opening brief is strangely mute about whether Lenix requested severance. Respondent's brief argues he forfeited his right to appellate review because he never requested severance. Incomprehensibly, appellant's reply brief characterizes the Attorney General's forfeiture argument as, "to say the least, surprising," fails to state whether he requested severance of count 4, and tacitly concedes the negative by arguing "only for the sake of discussion" that the forfeiture doctrine is discretionary rather than mandatory. Briefing like that-inscrutable at best, devious at worst-needlessly saps limited judicial resources and fails to promote the client's legitimate interests. Our independent review of the record shows that Lenix never requested severance of count 4. On that record, he forfeited his right to appellate review. (<u>People v. Pinholster</u> (1992) 1 Cal.4th 865, 931.)

With reference to count 5, on April 28, 2004, the court ruled on four motions with reference to the interwoven issues of gang evidence and severance. Lenix filed a motion to sever count 5 from the other four counts on the ground that the danger of undue prejudice outweighed the probative value of the gang evidence element, and the prosecutor filed a motion in opposition. Additionally, the parties filed motions in limine to, respectively, admit and exclude gang evidence. In anticipation of receipt of a gang evidence stipulation, the court granted the prosecutor's motion in limine and denied both of Lenix's motions without prejudice.

On May 3, 2004, Lenix's attorney filed a motion requesting that the court relieve him as counsel of record on the ground of an irreconcilable conflict of interest. The court granted the motion, declared a mistrial, and appointed new counsel.

On December 6, 2004, the court ruled on four motions with reference to the issues of gang evidence and severance. Lenix filed a motion to sever count 5 from the other four counts on the ground that the danger of undue prejudice outweighed the probative value of the gang evidence element, and the prosecutor filed a motion in opposition. Additionally, the parties filed motions in limine to, respectively, admit and exclude gang evidence. Noting gang involvement in the case and finding some cross-admissibility of evidence and no substantial likelihood of prejudice, the court denied both of Lenix's motions.

On December 7, 2004, Lenix's new counsel took ill. On December 13, 2004, the court again declared a mistrial and again appointed new counsel.

On January 21, 2005, Lenix filed a motion for discovery of gang evidence. On January 27, 2005, the prosecutor filed a response. On February 2, 2005, the court granted the motion as modified.

On April 5, 2005, the prosecutor filed a motion in limine to admit gang evidence. At a hearing that day, Lenix offered to stipulate to the gang evidence element of count 5, and the prosecutor, acknowledging tactical reasons for not planning to introduce evidence of Lenix's admission of gang membership, tentatively agreed, but the court, on the ground that the jury had to hear evidence on whether Lenix was an "active street gang member," declined to accept a stipulation. Ruling on the prosecutor's motion, the court stated that gang evidence was admissible solely for proof of the gang evidence element of count 5 and admissible-contingent on a showing of credible evidence-for proof of Lenix's membership in the same criminal street gang as the other coconspirators but that gang evidence was otherwise inadmissible.

Appellant's opening brief argues, "Before each of his three trials in this case, appellant moved for a separate trial of count 5." (Italics added.) Although the brief cites to the record of the motions Lenix filed before the first and second trials (each of which ended in a mistrial) and to the record of the opposition the prosecutor filed before the second trial, nowhere does the brief cite to the record of any motion Lenix filed before the third trial (from which the judgment

29

now on appeal arises). Appellant's opening brief states, "The parties never argued, and the Court never ruled upon, severance." (Italics added.)  Respondent's brief, however, cites to the record of argument by the parties and rulings by the court on motions to sever Lenix filed before his first and second trials. Additionally, respondent's brief states that apart from those two motions Lenix filed no motion to sever before the third trial and that his failure to do so forfeited his right of appellate review.

Astoundingly, appellant's reply brief persists not only in arguing that "[b]efore each of the three trials, defense counsel moved for a separate trial of count 5," but also in repeating the mistaken citations to the record in appellant's opening brief. Appellant's reply brief simply ignores the citations in respondent's brief to the record of argument by the parties, and rulings by the court, on the motions to sever Lenix filed before his first and second trials and inexplicably claims the court never ruled on those motions before his third trial. Lenix's appellate attorney's misstatement of the record induces us to remind her of her duty to "employ, for the purpose of maintaining the causes confided to ... her those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law."(Bus. & Prof.Code, § 6068, subd. (d).) She is advised to read with care In re S.C. (2006) 138 Cal.App.4th 396.

Our independent review of the record confirms that the Attorney General cites to the record correctly and that Lenix's appellate attorney cites to the record incorrectly. Rule 14's mandate is straightforward: "Each brief must ... [¶] ... [s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."(Cal. Rules of Court, rule 14(a)(1)(C).) The Attorney General's correction of the misstatement of the record in appellant's opening brief gave Lenix's appellate attorney the opportunity to amend her argument in appellant's reply brief. Instead, she parroted the same inapt argument and the same misstatement of the record as she did in appellant's opening brief. Her intransigent violation of rule 14 is inexcusable. A reviewing court has no duty to address a claim a party presents in flagrant violation of a rule of court. (In re David L. (1991) 234 Cal.App.3d 1655, 1661.) We decline to do so.

Even if we were to consider Lenix's arguments, he could not establish a right to relief. Neither of his status offenses for possession of firearms was even remotely as inflammatory as his substantive offenses of committing, attempting to commit, and conspiring to commit murder. His briefing fails to show how joinder possibly could have so prejudiced him as to have constituted either a miscarriage of justice or a denial of his constitutional right to due process. "One asserting prejudice has the burden of proving it; a bald assertion of prejudice is not sufficient."(People v. Johnson (1988) 47 Cal.3d 576, 591.) After denials-not once but twice-of motions to sever count 5, the defense chose to litigate the admissibility of gang evidence by filing a motion in limine that, by and large, the court granted.

Stonewalling the Attorney General's correction of the misstatements of the record in appellant's opening brief, appellant's reply brief fails to acknowledge any of those three rulings but instead raises a new argument (absent from appellant's opening brief) that Lenix's trial attorney rendered ineffective assistance of counsel by not having "fully litigated" the severance issue. A reviewing court will not consider a point raised for the first time in appellant's reply brief. (People v. Jackson (1981) 121 Cal.App.3d 862, 873.) Even if we were to consider that argument, Lenix could not establish a right to relief on appeal since the record fails to show that his trial attorney's action or inaction was not a reasonable tactical choice. (People v. Jones (2003) 30 Cal.4th 1084, 1105.)

(LD 7, pp. 18-22).

///

30

1          2.  Analysis.

2                a.  Procedural Bar.

3          Respondent first contends that because the state court procedurally barred the claim as to count

4    four, the claim as to that count is not amenable to federal habeas review.  The Court agrees.

5          In its decision, the 5th DCA concluded that "[o]ur independent review of the record shows that

6    Lenix never requested severance of count 4. On that record, he forfeited his right to appellate review."

7    State courts may decline to review a claim based on a procedural default.  Wainwright v. Sykes, 433

8    U.S. 72, 86-87 (1977).  Federal courts "will not review a question of federal law decided by a state

9    court if the decision of that court rests on a state law ground that is independent of the federal question

10   and adequate to support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546

11   (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v. Nunnemaker, 501 U.S. 797,

12   801 (1991); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach

13   the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural

14   requirements . . . ."); see also Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  This concept is

15   commonly referred to as the procedural default doctrine, which is based on concerns of comity and

16   federalism.  Coleman, 501 U.S. at 730-32.  If the court finds an independent and adequate state

17   procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the

18   procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result

19   in a fundamental miscarriage of justice."  Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993);

20   Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

21          The mere occurrence, however, of a procedural default will not necessarily bar a federal court

22   from reviewing claims in a petition for writ of habeas corpus.  In order for the procedural default

23   doctrine to apply and thereby bar federal review, the state court determination of default must be

24   grounded in state law that is both *adequate* to support the judgment and *independent* of federal law.

25   Ylst, 501 U.S. at 801; Coleman, 501 U.S. at 729-30; see also Fox Film Corp., 296 U.S. at 210.  Put

26   another way, the procedural default doctrine will apply only if the application of the state procedural

27   rule provides "an adequate and independent state law basis" on which the state court can deny relief.

28   Park, 202 F.3d at 1151, *quoting*, Coleman, 501 U.S. at 729-30.

"For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (citing Michigan v. Long, 463 U.S. 1032, 1040-41, 103 S.Ct. 3469 (1983)); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be interwoven with federal law.'" (quoting Coleman, 501 U.S. at 735, 111 S.Ct. 2456)). "A state law is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'" Park, 202 F.3d at 1152 (quoting Ake v. Oklahoma, 470 U.S. 68, 75, 105 S.Ct. 1087 (1985)).

To be deemed adequate, the state law ground for decision must be well-established and consistently applied. Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court.")(quoting Ford v. Georgia, 498 U.S. 411, 424, 111 S.Ct. 850 (1991)). Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least over time, can become known and understood within reasonable operating limits.'" Id. at 377 (quoting Morales, 85 F.3d at 1392).

California law requires that, with certain exceptions, appellate courts will not consider claims of error that could have been, but were not, raised in the trial court. Peole v. Vera, 15 Cal.4th 269, 275 (1997). That rule has been deemed both independent of federal law, People v. Williams, 16 Cal.4th 153, 208 (1997), and consistently applied. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002). Here, the record establishes that defense counsel failed to articulate a timely request for severance as to count four; hence, the state court's determination that count four has been procedurally defaulted bars federal review in this case.

b. Merits.

Even if the claim as to count four were not procedurally barred, it would fail on its merits, as would Petitioner's claim as to count five. There is no clearly established federal law which holds that joinder or consolidation of charges may violate the Constitution. In United States v. Lane, 474 U.S.

438, 446 n. 8, 106 S.Ct. 725 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."  However, in Young v. Pliler, the Ninth Circuit noted:

> Lane considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. See Lane, 474 U.S. 438, 446 & n. 9, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, Lane's broad statement-found in a footnote without citation to any legal authority-that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

Young, 273 Fed.Appx. 670, n. 1 (9th Cir.2008) (unpublished); see also Collins v. Runnels, 603 F.3d 1127, 1132–33 (9th Cir.2010).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.  Given that there is no clearly established Federal law in this instance, the Court cannot grant relief, since habeas relief is triggered only when the state court adjudication runs afoul of clearly established federal law.

However, even assuming that the Supreme Court's footnote could be considered clearly established federal law, no constitutional violation occurred in this case.  "Improper joinder does not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his right to a fair trial." United States v. Lane, 474 U.S. 438, 446, fn. 8.  Joinder of offenses results in a constitutional violation only if it renders a state trial unfair and violates due process.  Herring v. Meachum, 11 F.3d 374, 377 (2nd Cir. 1993).  A defendant must show actual prejudice resulted from the events as they unfolded during trial.  Herring, supra, 11 F.3d at 378, citing Opper v. U.S., 348 U.S. 84, 94-95 (1954).  This prejudice is shown if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict.  See Bean v. Calderon, 163 F.3d 1073, 1086 (9th Cir. 1998); see also, Spencer v. Texas, 385

U.S. 554, 562 (1967) (while some prejudice may flow from joinder of offenses in criminal offenses, the risk is justified by convenience and guarded against by limiting instructions); Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991) (consolidation rests in the sound discretion of the state trial court).

In the instant case, Petitioner has not made the required showing that joinder of (or failure to sever) the two status offenses was a due process violation that had a substantial and injurious effect on the jury's verdict.  The record clearly shows that the parties stipulated to the fact that, with reference to count four (possession of a weapon by a felon), Petitioner admitted to his prior felony conviction, and that, with reference to count five (possession of a loaded firearm in a public place by an active participant in a criminal street gang), Petitioner admitting to those elements of the offense pertaining to his active membership in a criminal street gang.  No other substantive evidence was admitted at trial regarding either Petitioner's gang involvement or as to the nature of the prior felony conviction.  Moreover, the jury was instructed that the stipulated evidence was admitted for the limited purpose of establishing certain elements of those offenses and should not be used for any other purpose.  (3 CT 716; CALJIC No. 2:09.).  As Respondent correctly points out, the prosecution made no argument in closing regarding the stipulated evidence.  Here, the stipulated evidence was easily compartmentalized and not likely to cause juror confusion.  See Herring v. Meachum, supra, 11 F.3d 374, 378; Closs v. Leapley, 18 F.3d 574, 578 (8th Cir. 1994) (evidence was simple and distinct enough so there was no possibility of juror confusion).  Also, the jury is presumed to have followed the limiting instruction that they not consider the stipulations for any purpose other than the elements in counts four and five to which they applied.  See, e.g., Aquilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997); Nguyen v. McGrath, 323 F.Supp.2d 1007, 1026 (N.D. Cal. 2004).

Finally, as the 5th DCA pointed out, even assuming technical error in failing to sever those claims from the other charges, any prejudice from the two status offenses was minimal compared to the overwhelming evidence presented that Petitioner purposefully killed the victim.  As the jury had already heard highly prejudicial evidence regarding Petitioner's involvement in the conspiracy to commit murder, Petitioner's stipulation to elements of the two status offenses, i.e., membership in a criminal street gang and a prior unspecified felony conviction, can hardly be said to have had a substantial and injurious impact on the jury's verdict.  Brecht, 507 U.S. at 637-638.  Accordingly, this

claim should be rejected.

E.   Admission Of Statement Of Murder Victim

Petitioner next contends that his Sixth Amendment right to confrontation and his Fourteenth Amendment right to due process were violated by the admission of a pre-shooting statement by the murder victim.  This contention is also without merit.

1.   The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Lenix argues that Lamar's statement that Lenix dropped a .38 moments before the shooting was inadmissible hearsay that denied his constitutional rights to confrontation and due process. The Attorney General argues the contrary.

Preliminarily, we will address a misstatement of the record by Lenix's appellate attorney. Appellant's opening brief states, "During the first trial, Lamar's hearsay statement was excluded as inadmissible hearsay," for which the sole citation to the record is to a brief dialogue between the prosecutor and Curtis on direct examination:

"Q [BY PROSECUTOR]. When you heard that sound, did you turn around and look?

"A. No, I didn't [¶] I didn't look until Lamar, Lamar had turned around before I turned around.

"Q. All right. [¶] Now, I can't get into what Lamar said, because, that's hearsay?

"A. Um-hum.

"Q. All right."

Respondent's brief is silent about that dialogue. Appellant's reply brief states, "Preliminarily, appellant notes that respondent at no point acknowledges that Lamar's hearsay statement was excluded from the first trial as inadmissible hearsay." (Italics added.) The sole citation to the record in both of appellant's briefs, however, is to the brief dialogue quoted above. That shows only that the prosecutor characterized Lamar's statement as hearsay and that Curtis agreed with him-not that the court excluded the evidence as hearsay. In short, the record to which Lenix's appellate attorney cites contradicts her own misstatement of the record.

Our independent review of the record discloses an excerpt from the prosecutor's further direct examination of Curtis that shows the altogether different ground on which the court excluded Lamar's statement:

"Q. What was your plan, at this point?

"A. My plan was to get out of there as fast as I possibly could.

"Q. Why?

"A. Because Lamar had stated-

"THE COURT: Hold on.

"THE WITNESS: Okay.

"THE COURT: I apologize for interrupting, that was a fair question, fair response. [¶] But, again, as counsel has indicated and the ladies and gentlemen of the jury, understand, what is said by someone else, as a general rule, is what we call hearsay. [¶] Someone else said it. [¶] And usually hearsay is not allowed to be presented. [¶] There are a lot of exceptions to the hearsay rule, but, I'm not thinking of one right now. [¶] Are you, counsel?

"[PROSECUTOR]: Well, off the top of my head, *I would offer it for the limited purpose of showing why they were trying to get out of there.*

"THE COURT: I thought we had-[¶] Well, actually, we did not talk about this, but, suffice it to say, *something was said and, as a result of whatever it was that was said and what this witness heard up to this point, he was getting out of there as quickly as possible.[¶] And I think we've got that established, without going into what may have been said.*[¶] So, counsel, let's proceed."(Italics added.)

In short, the record shows that the court excluded Lamar's statement not as inadmissible hearsay but as cumulative evidence of why he and Curtis were "trying to get out of there." We turn now to the arguments of the parties.

Hearsay was the sole basis of the motion Lenix filed at his third trial to request relief on constitutional grounds. At the hearing on the motion, the prosecutor argued that he was offering the statement not for the truth of the matter asserted but only for the purpose of showing "why all of a sudden these two guys, who were out having a nice, casual time, are suddenly getting to their car in an expedited manner and why Curtis is concerned when [Deshonta] runs up and tries to stall the departure of his cousin." Lenix's trial attorney retorted that "these people were, as counsel is saying, in the process of leaving already," which, of course, is to state the cumulative evidence rationale on which the court actually excluded Lamar's statement at his first trial. The court denied the motion and offered to give a limiting instruction, were the defense to request one.

"'Hearsay evidence' is evidence of a[n] [extrajudicial] statement offered to prove the truth of the matter stated." (Evid.Code, § 1200, subd. (a), italics added.) Evidence offered to explain conduct or state of mind, on the other hand, is not hearsay. (People v. Hill (1992) 3 Cal.4th 959, 987, overruled on another ground by Price v. Superior Court (2001) 25 Cal.4th 1046, 1069, fn. 13; People v. Bolden (1996) 44 Cal.App.4th 707, 714-715.) Since Lamar's non-hearsay statement explained why Curtis urged Lamar to leave, why Curtis kept an eye on him as the cousins both tried to leave, and why Curtis saw Lenix shoot him, the court did not err in ruling the evidence admissible. (People v. Turner, supra, 8 Cal.4th at pp. 189-190.) Since the sole premise of his written motion at trial and of his argument on appeal is that his statement was inadmissible hearsay, his confrontation and due process arguments fail for want of a valid premise.

Nonetheless, since both parties argued Evidence Code section 352 at the hearing on the motion, we will consider that ground as well to determine whether the court's admission of Lamar's statement-not as hearsay but as nonhearsay-was error. The record shows that Curtis testified on direct examination to events that occurred after he heard "something that hit the ground and didn't break":

"Q.... And did your cousin Lamar-did he turn around when that sound came out?

"A. Yes.

"Q. And after your cousin turned around, did you turn around?

"A. Yes.

36

"Q. When you turned around, what did you see?

"A. I saw the defendant reaching down receiving-retrieve something from the ground and tuck it inside of his waistband and walk down the alley southbound. [¶] ... [¶]

"Q. Were you able to see at that point what it was that the defendant had picked up and put into his waistband?

"A. No, I didn't see exactly what it was.

"Q. Did your cousin say something about what it was that caused you some concern?

"A. Yes.

"Q. What did your cousin say?

"A. He said, 'Curt, this guy dropped a .38.'

"Q. And did that cause you-it's going to sound like a stupid question, but did that cause you some concern?

"A. Yes.

"Q. Why?

"A. Because there was a guy within, you know, a few feet of me and he has a gun in his hand.

"Q. What did you do at that point?

"[LENIX'S ATTORNEY]: Objection, your Honor. I would ask for a limiting instruction at this point. It's hearsay.

"[THE COURT]: You're talking about the statement made.

"[LENIX'S ATTORNEY]: The statement made by Lamar Rufus.

"THE COURT: Okay. And I will give that limiting instruction. Ladies and gentlemen, the statement made by Lamar Rufus to the extent that 'That guy has a .38,' that is not received for purposes of establishing the truth of the statement, but rather simply it's an operative fact, the fact that the statement was made and not for the truth of what was said. Proceed, Mr. [Prosecutor].

"BY MR. [PROSECUTOR]:

"Q. After Lamar said, 'That guy's got a .38,' 'That guy dropped a .38,' whichever it was, you became concerned, what did you tell your cousin?

"A. I told him, 'Hey, let's get out of here. Let's go now.'"

Curtis later testified that on the basis of Lamar's statement to him he told the 911 operator that the gun with which Lamar had been shot was a .38. Immediately afterward, the court gave a limiting instruction to the jury:

"THE COURT: I'll remind you, ladies and gentlemen, that testimony earlier about the statement made to the witness by Lamar Rufus was not offered to prove the truth of the matter stated. That same limiting instruction applies to Mr. Curtis Rufus' repetition of

37

that, but simply the fact that it was said, not that it necessarily was or was not a .38 or anything else."

In argument to the jury, the prosecutor himself reminded the jurors that Lamar's statement was "not offered to prove that Mr. Lenix had a .38 or any other gun" but rather "to show why all of a sudden right now, right when they hear that and see that, right when Lamar says that, this stops being just a casual evening with these guys out having a good time, and suddenly it becomes a precarious, concerning situation." His argument buttressed the court's limiting instructions.

On appellate review of an Evidence Code section 352 ruling, the deferential abuse of discretion standard governs. (People v. Kipp (2001) 26 Cal.4th 1100, 1121.)The rule is settled that, in the absence of a contrary showing, the appellate court presumes that the jurors followed the court's instructions. (People v. Smithey (1999) 20 Cal.4th 936, 961; People v. Stanley (1995) 10 Cal.4th 764, 837.)The record shows no abuse of discretion. Since neither of the statutory grounds-hearsay and Evidence Code section 352-reasonably implicit in Lenix's constitutional arguments has merit, and since the record answers in the negative the question whether the court committed an error rendering his trial so fundamentally lacking in fairness as to violate due process, we reject his constitutional arguments as well. (See People v. Sanders (1995) 11 Cal.4th 475, 510, fn. 3; Jammal v. Van de Kamp (9th Cir.1991) 926 F.2d 918, 919-920.)

(LD 7, pp. 22-27).

### 2. Federal Standard.

The Sixth Amendment to the United States Constitution grants a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. "The 'main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" Fenenbock v. Director of Corr. for California, 692 F.3d 910, 919 (9th Cir.2012) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986)). The Confrontation Clause applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 406 (1965).

In Crawford v. Washington, 541 U.S. 36 (2004), the United States Supreme Court held that the Confrontation Clause bars the state from introducing into evidence out-of-court statements which are "testimonial" in nature unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable. The Crawford rule applies only to hearsay statements that are "testimonial" and does not bar the admission of non-testimonial hearsay statements. Id. at 42, 51, 68. See also Whorton v. Bockting, 549 U.S. 406, 420 (2007) ("the Confrontation Clause has no application to" an "out-of-court nontestimonial statement.")

Although the Supreme Court in Crawford declined to provide a comprehensive definition of the term "testimonial," it did state that "[s]tatements taken by police officers in the course of interrogations

38

are ... testimonial under even a narrow standard." <u>Crawford</u>, 541 U.S. at 52. The court also provided the following "formulations" of a "core class" of testimonial statements: (1) "ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;" (2) "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;" and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." <u>Id</u>. at 51–52. The Supreme Court also pointed out that the Sixth Amendment Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." <u>Id</u>. at 59, n. 9.

Recently, the United States Supreme Court reiterated that the Confrontation Clause "has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." <u>Williams v. Illinois</u>, — U.S. —, 132 S.Ct. 2221, 2228 (2012). Thus, "[u]nder settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." <u>Id</u>. The Court noted that an out-of-court statement is testimonial if it has "the primary purpose of accusing a targeted individual of engaging in criminal conduct" and, usually, it involves a "formalized statement[ ] such as affidavits, depositions, prior testimony, or confessions." <u>Id</u>. at 2242.

> 3. <u>Analysis</u>.

Here, the 5th DCA, noting that defense counsel's objection was premised upon hearsay, had little trouble accepting the prosecution's response that the statement was not offered for the proof of the matter asserted but to establish why the two victims went to their car and attempted to leave the area.  The state court agreed that the statement was not offered for the proof of the matter asserted, and, hence, was not hearsay.  Accordingly, as Respondent correctly argues, the admission of the victim's statement does not implicate Petitioner's Sixth Amendment rights under <u>Crawford</u>.  And, as Respondent also points out, even if the statement were hearsay, it is not testimonial under <u>Crawford</u> or its progeny.  Accordingly, Petitioner's Sixth Amendment argument fails.

> F.  <u>Limiting Cross-Examination Of Detective</u>

Petitioner next contends that his constitutional rights to confrontation and due process were

violated when the trial court precluded defense counsel from eliciting testimony from a detective that a videotape showed Petitioner and Johnson exchanging an object.  This contention is without merit.

        1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Lenix argues that improper limitation of cross-examination of a detective about whether he handed the gun to someone else shortly before the shooting constituted a miscarriage of justice and a denial of his constitutional rights to confrontation and due process. The Attorney General argues the contrary.

The issue before us originated in direct examination of the detective by the prosecutor:

"Q.... After Curtis described to you what happened in that alley where his cousin Lamar was murdered, after he gave you that description, did you then look at a videotape?

"A. Yes. [¶] ... [¶]

"Q. Did the things you saw on the videotape-did they correspond to what he had told you before you ever looked at the videotape?

"[LENIX'S ATTORNEY]: Objection. Vague.

"THE COURT: Overruled.

"THE WITNESS: Yes. The videotape account was very similar to his original statement.

"BY MR. [PROSECUTOR]:

"Q. Were there any significant differences between what's on the video and what he told you?

"A. No."

A portion of the defense cross-examination of the detective likewise is germane to the issue before us:

"Q. At any time when these two men come together and before they separate and one goes over towards Curtis' car and one comes down into the side alley to get the red car, did he ever describe to you any movement by either of the individuals where the person pulled up his shirt and reached into his waistband?

"A. No.

"Q. Did he ever describe to you that the person appeared to pull an object out of his waistband and hand it to the other man?

"A. No."

Lenix's attorney argued to the jury that the videotape showed one person passing the gun to another person and that since Curtis never saw "the passing of the object back and forth" the jury should infer that he was never in the alley and that everything he "told us was fabricated." During the jury's deliberations, counsel memorialized on the record a sidebar conference not reported at the time. Lenix's attorney stated that the detective had written in his report that on the videotape he had seen the weapon going from the hand of the suspect whom Curtis

identified as the shooter to the hand of the other suspect, argued that if Curtis had been in the alley he would have seen the gun changing hands, and objected to the court's refusal to allow cross-examination of the detective as a denial of his constitutional rights to confrontation and due process. He characterized Curtis's identification of the shooter and the detective's observation about the videotape as inconsistent.

The prosecutor, on the other hand, characterized the detective as "no more qualified than any of the 12 people on the jury to render some sort of expert opinion as to what appears or does not appear on that videotape" and argued that his "opinions as to what is transpiring on that videotape" were irrelevant since the videotape "speaks for itself." Lenix's attorney denied that he was "looking for opinions or expert opinions" and argued instead that he was trying to impeach the detective on the issue of handing off the gun just before the shooting. The court stated that even if the detective and Curtis had seen something on the videotape that Curtis had not seen on the night of the shooting there was no evidence that Curtis had monitored Grayson, Johnson, and Lenix continuously from the time when someone dropped something to the time when someone shot Lenix. On that rationale, the court found "there wasn't anything there that was inconsistent" and declined to permit the detective to testify "that, in his opinion, one of the subjects on the tape handed a gun to another subject on the tape."

In his motion for a new trial, Lenix renewed the same argument. As before, the prosecutor opposed the motion on the ground that the detective's opinion was "irrelevant" and that "the tape speaks for itself." The court denied the motion.

Nothing in the record shows that the detective had any expertise superior to the common experience of the jurors in perceiving the contents of the videotape that the jurors watched at trial. (See People v. Torres (1995) 33 Cal.App.4th 37, 45; cf. Evid.Code, § 801.) In his report, the detective wrote that he saw someone handing off a gun to someone else in the videotape. Since his report was consistent with the testimony Lenix's attorney sought from him, the request that he so testify was entirely at odds with Evidence Code section 1235's fundamental requirement of an inconsistency between the witness's prior statement and testimony. (People v. Johnson, supra, 3 Cal.4th at p. 1219.) The constitutional right to cross-examine witnesses is not absolute, and judges retain wide latitude to impose reasonable limits on cross-examination so as to minimize confusion of issues, harassment of witnesses, and consumption of time. (Delaware v. Van Arsdall (1986) 475 U.S. 673, 679; Chambers v. Mississippi (1973) 410 U.S. 284, 295; In re Ryan N. (2001) 92 Cal.App.4th 1359, 1386.) Since the court's order barring the inquiry at issue was well within that wide latitude, no denial of Lenix's constitutional rights to confrontation and due process ensued.

On the authority of Evidence Code section 352, Lenix argues that the court's order constituted an abuse of discretion. At sidebar and in his motion for a new trial, however, he argued solely constitutional grounds. On that record, he forfeited his right to appellate review of the statutory ground. (People v. Ghent (1987) 43 Cal.3d 739, 766; Evid.Code, § 353, subd. (a).)

Even if we were to consider Lenix's argument, he could not establish a right to relief. An appellate court will disturb an Evidence Code section 352 ruling only if the record shows an exercise of discretion in an arbitrary, capricious, or patently absurd manner that caused a manifest miscarriage of justice. (People v. Rodriguez (1999) 20 Cal.4th 1, 9-10.) Here, the court's ruling euthanized a fatally defective theory of admissibility on which Lenix's appellate attorney wastes a dozen pages of briefing in a doomed attempt at resuscitation. She is advised to take to heart an observation that this court made nearly 30 years ago: "The use of a well-aimed and finely-honed blade, rather than the scattergun with its dangerous spray effect, is often the most effective method of assuring a successful and final victory." (People v. Houts, (1978) 86 Cal.App.3d 1012, 1022.)

(LD 7, pp. 27-30).

1          2.  <u>Federal Standard</u>.

2          Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the

3    Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees

4    criminal defendants "a meaningful opportunity to present a complete defense" and the right to present

5    relevant evidence in their own defense. Holmes v. South Carolina, 547 U.S. 319, 324, 126 S.Ct. 1727,

6    164 L.Ed.2d 503 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d

7    636 (1986)). This right is not unlimited, but rather is subject to reasonable restrictions. United States v.

8    Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998); Taylor v. Illinois, 484 U.S. 400,

9    410, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (An accused does not have an "unfettered right" to present

10   any evidence he or she wishes); Alcala v. Woodford, 334 F.3d 862, 877 (9th Cir.2003). A state

11   evidentiary rule excluding evidence does not abridge a criminal defendant's right to present a defense

12   unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused."

13   Scheffer, 523 U.S. at 308. See also Crane, 476 U.S. at 689–91.

14          Specifically with regard to cross-examination, the Sixth Amendment guarantees a defendant in

15   criminal proceedings the right "to be confronted with the witnesses against him."  U.S. CONST. amend

16   VI.  The Supreme Court has indicated that "'[t]he main and essential purpose of confrontation is to

17   secure for the opponent the opportunity of cross-examination.'"  Davis v. Alaska, 415 U.S. 308, 315-

18   16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (quoting 5 J. Wigmore, Evidence § 1395, at 123 (3d

19   ed.1940)). The right to cross-examination is thus constitutionally protected. A criminal defendant can

20   prove a violation of his Sixth Amendment rights by "showing that he was prohibited from engaging in

21   otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the

22   witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw

23   inferences relating to the reliability of the witness.'" Delaware v. Van Arsdall, 475 U.S. 673, 680, 106

24   S.Ct. 1431, 89 L.Ed.2d 674 (1986) (quoting Davis, 415 U.S. at 318, 94 S.Ct. 1105).

25          However, "[i]t does not follow, of course, that the Confrontation Clause of the Sixth

26   Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the

27   potential bias of a prosecution witness."  Id. at 679, 106 S.Ct. 1431. On the contrary, the right to cross-

28   examination "'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal

1    trial process.'"  Michigan v. Lucas, 500 U.S. 145, 149, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991)

2    (quoting Rock v. Arkansas, 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).  "'[T]rial judges

3    retain wide latitude' to limit reasonably a criminal defendant's right to cross-examine a witness 'based

4    on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'

5    safety, or interrogation that is repetitive or only marginally relevant.'"  Id. (quoting Van Arsdall, 475

6    U.S. at 679, 106 S.Ct. 1431).  However, "[r]estrictions on a criminal defendant's rights to confront

7    adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes

8    they are designed to serve.'"  Id. at 151, 111 S.Ct. 1743 (quoting Rock, 483 U.S. at 56, 107 S.Ct. 2704).

9                        3.  Analysis.

10             Here, the 5th DCA rejected Petitioner's claim insofar as it was based upon state law as being

11   procedurally barred for failure to raise a timely objection.  As with previous claims, that ground is

12   independent and adequate to support the state bar and to deny review on the merits of the state claim.

13             Likewise, the state court rejected Petitioner's constitutional claim as being well within the limits

14   set forth in the Van Arsdall line of cases discussed above.  Specifically, Petitioner sought to highlight

15   what he believes are inconsistencies in the various accounts given by Detective Krueger and  Curtis and

16   what the videotape showed, i.e., that the videotape showed Petitioner and Johnson passing a gun from

17   one to the other, something defense counsel believed Krueger had also seen on the tape, while Krueger

18   testified that nothing on the videotape varied from Curtis's original statement, which did not indicate

19   that Petitioner and Johnson had exchanged anything before the shooting.

20             The 5th DCA first pointed out that defense counsel was seeking to elicit from Krueger testimony

21   that he had written in his police report that he had initially seen something being passed between

22   Petitioner and Johnson on the tape.  Since the testimony being elicited was not different from what was

23   already in the police report, it was not admissible as an exception to the hearsay rule under Cal. Evid.

24   Code § 1235, which permits hearsay statements that are "inconsistent with [the witness's] testimony at

25   the hearing and is offered in compliance with Section 770."  Cal. Evid. Code § 1235.  The state court

26   then noted that, as the trial court had pointed out, Krueger was not an expert in examining videotapes,

27   that the tape itself could be seen by the jurors and "spoke for itself," and that, under the "wide latitude"

28   given state trial judge's to control the trial process, Petitioner's constitutional rights were not violated

by excluding the defense's line of questioning.

Petitioner's argument regarding prejudice relies upon a circuitous series of assumptions, all of which must be proven true, before even potential prejudice could inure to Petitioner from the trial court's decision to exclude Krueger's trial testimony.  The Court is not persuaded that the state court's adjudication was objectively unreasonable and, in any event, given the entire record as a whole, any technical error that may have arisen in excluding the detective's testimony was harmless under Brecht.

G.  Closing Argument

Petitioner contends that the prosecutor committed misconduct during closing argument.  This contention is without merit.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

Lenix argues that three occurrences of prosecutorial misconduct in argument to the jury constituted a denial of his constitutional right to due process. The Attorney General argues that Lenix forfeited his right to appellate review of two of those three claims and that no prosecutorial misconduct occurred.

First, Lenix argues that the prosecutor improperly vouched for Curtis's credibility by arguing, inter alia, that he was "not making this up," that on the night of the shooting he had "no ax to grind" against Grayson, Johnson, or Lenix, and that he had "no reason in the world why he would come in here and tell you these people did what they did unless it, in fact, were true." Second, he argues that the prosecutor improperly characterized Curtis, inter alia, as a victim of Lenix's "attacking him by attempting to kill him" and of defense counsel's "attacking him by calling him a liar."

The Attorney General's forfeiture argument applies to those two claims. The accused generally forfeits the right of appellate review of a prosecutorial misconduct issue in the absence of a timely objection and a timely request to admonish the jury. (People v. Fierro (1991) 1 Cal.4th 173, 207.) Although the rule "does not apply when the harm could not have been cured," Lenix's briefing inexplicably characterizes the prosecutor's comments with a single word-"incurable"-and never even attempts to explain why. (People v. Benson (1990) 52 Cal.3d 754, 794.)The record shows that the prosecutor's remarks about Curtis's credibility were permissible inferences from the evidence and that his comments about defense counsel's attack on Curtis, even if arguably improper, were not prejudicial, so he forfeited his right to appellate review. (Id. at pp. 794-795.)  He fails to persuade us that any of his alternative arguments-that his trial attorney's failure to make a timely objection and a timely request to admonish the jury constituted ineffective assistance of counsel, that the trial court's failure to discharge its statutory duties to control the proceedings constituted a denial of his constitutional right to due process, and that the appellate court's invocation of the forfeiture doctrine is discretionary-qualifies as "a talisman in whose presence the [forfeiture] fades away and disappears." (Coolidge v. New Hampshire (1971) 403 U.S. 443, 461.)

Third, Lenix argues that the prosecutor improperly implied in argument to the jury that he removed his glasses to disguise his appearance in his booking photograph.  Neither party put on any evidence about whether he removed his glasses during booking or whether he ever wore glasses.  His argument to the jury noted that no one identified anyone in the alley wearing

glasses, that a defense exhibit shows him wearing glasses, that he wore glasses during trial, that jurors probably saw him using eye drops during trial, and that he has a medical problem requiring corrective lenses. The prosecutor objected on the ground of facts not in evidence. "As to vision problems other than wearing glasses," the court sustained the objection and struck the argument from the record.

In rebuttal, the prosecutor agreed that Curtis never identified anyone in the alley wearing glasses and that Lenix wore glasses at trial. After an off-the-record sidebar, the court overruled a prosecutorial misconduct objection.  Afterward, without objection, the prosecutor concurred that the defense exhibit to which Lenix's attorney referred earlier shows him wearing glasses but added a caveat:  "He's wearing sunglasses, ladies and gentlemen." (Italics added.)

Once jury deliberations commenced, counsel memorialized on the record the sidebar just before the prosecutorial misconduct objection.  Lenix's attorney argued that jail policy requires arrestees to remove their glasses to make their eyes and faces visible and that the prosecutor "knew or should have known that." The prosecutor disclaimed knowledge of, and doubted the existence of, that policy. The court accepted the prosecutor's representation and found no prosecutorial misconduct.

Later, at the bifurcated court trial on the prison term priors, a sheriff's department identification technician testified that jail policy requires arrestees to remove their glasses before photographs are taken. Afterward, the prosecutor stated that when he argued to the jury he did not know of that policy and, commendably, that after he argued to the jury he reviewed nine photographs from a camera found at Lenix's residence at the time of his arrest of which seven showed him without glasses and two showed him with glasses. The court let the prior ruling stand.

On a record showing, first, a defense argument objectionable for inadequate evidentiary support; second, a good faith, though mistaken, reply by the prosecutor; and, third, a quick correction of the prosecutor's own errors once new evidence came to his attention, we agree with the trial court's characterization of the issue as "rather innocuous in any event." In the absence of anything deceptive, egregious, or reprehensible about the prosecutor's behavior, there was no prosecutorial misconduct. (Cf. People v. Hill (1998) 17 Cal.4th 800, 819.)

(LD 7, pp. 31-33).

### 2. Federal Standard.

Prosecutorial misconduct does not, per se, violate a petitioner's constitutional rights. Jeffries v. Blodgett, 5 F.3d 1180, 1191 (9th Cir.1993) (citing Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), and Campbell v. Kincheloe, 829 F.2d 1453, 1457 (9th Cir.1987)). Rather, success on a claim of prosecutorial misconduct requires a showing that the conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. at 181 (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Put another way, prosecutorial misconduct violates due process when it has a substantial and injurious effect or influence in determining the jury's verdict. See Ortiz–Sandoval, 81 F.3d 891, 899 (9th Cir.1996).

Factors to consider in whether a prosecutor commits misconduct in closing argument are whether he or she manipulates or misstates evidence, whether the prosecutor's comments implicate other specific rights of the accused such as the right to counsel or to remain silent, whether objectionable content was invited or provoked by defense counsel's argument, whether the trial court admonished the jurors, as well as the overall weight of evidence presented against the defendant. Darden, 477 U.S. at 181-182.

Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" [Citation.]" (People v. Samayoa (1997) 15 Cal.4th 795, 841, 64 Cal.Rptr.2d 400, 938 P.2d 2).   At the same time, "'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]'" (People v. Hill (1998) 17 Cal.4th 800, 819, 72 Cal.Rptr.2d 656, 952 P.2d 673.) In reviewing a claim of misconduct based on the prosecutor's argument to the jury, we will not "'lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (People v. Frye (1998) 18 Cal.4th 894, 970, 77 Cal.Rptr.2d 25, 959 P.2d 183.)

In analyzing claims about improper closing argument, the Court "must examine the 'entire proceedings' to determine" whether the challenged conduct violated petitioner's due process right to a fair trial. Sechrest v. Ignacio, 549 F.3d 789, 807 (9th Cir.2008) (quoting Hall v. Whitley, 935 F.2d 164, 165 (9th Cir.1991) (per curiam) (in turn quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974))).

   3.  Analysis.

Respondent argues that Petitioner's claim is procedurally barred and, in any event, is without merit.  The Court agrees.

First, Lenix argues that the prosecutor improperly vouched for Curtis' credibility by arguing, inter alia, that he was "not making this up," that on the night of the shooting he had "no ax to grind" against Grayson, Johnson, or Lenix, and that he had "no reason in the world why he would come in here and tell you these people did what they did unless it, in fact, were true."  Second, Petitioner

46

1    contends that the prosecutor improperly characterized Curtis as a victim of Lenix's "attacking him by

2    attempting to kill him" and of defense counsel's "attacking him by calling him a liar."

3         The 5th DCA rejected both of these contentions because the defense did not make a timely

4    objection at trial. As mentioned previously, California's appellate courts will not consider claims of

5    error that were not raised in the trial court by a timely objection, Vera, 15 Cal.4[th] at 275, a rule that rule

6    has been deemed both independent of federal law, Williams, 16 Cal.4[th] at 208, and consistently applied.

7    Melendez v. Pliler, 288 F.3d at 1125. Here, the record establishes that defense counsel failed to

8    articulate a timely objection to the prosecution's closing argument; therefore, the state court's

9    determination that the claim has been procedurally defaulted bars federal review in this case.

10        To the extent that Petitioner's claim relies upon a third incident in which the prosecution argued

11   during closing argument that Petitioner had intentionally taken off his glasses during his booking photo

12   in order to disguise his appearance, the Court agrees with the state court that any error here was

13   harmless. As the 5th DCA pointed out, the prosecutor was unaware, at the time he made those

14   statements, that the police had a policy requiring arrestee's to remove their glasses prior to booking

15   photos, but the prosecutor conceded that fact as soon as he became aware of it. The state court found

16   no intentional misconduct and, in essence, found any error to be de minimis. After carefully reviewing

17   the record under the appropriate federal standard, the Court concludes that the error, if any, had such

18   minimal prejudicial impact that is could not have had "a substantial and injurious effect or influence in

19   determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. at 623. Accordingly, Petitioner's

20   claim should be rejected.

21        H.  Consecutive Sentencing.

22        Petitioner further contends the trial court denied his constitutional right to a jury trial as to the

23   factors upon which the trial court's consecutive sentence was based. This contention is without merit.

24             1.  The 5th DCA's Opinion.

25   The 5th DCA rejected Petitioner's claim as follows:

26        Lenix argues that the court's imposition of consecutive terms on counts 1 and 2 without jury
          findings beyond a reasonable doubt of aggravating factors violated his constitutional right to a
27        jury trial. In light of the Supreme Court's rejection of a like argument (People v. Black (2005)
          35 Cal.4th 1238, 1244, distinguishing Blakely v. Washington (2004) 542 U.S. 296), the
28        doctrine of stare decisis obliges us to reject Lenix's argument (Auto Equity Sales, Inc. v.
          Superior Court (1962) 57 Cal.2d 450, 455).

1

2 (LD 7, p. 34).

      2. <u>Federal Standard</u>.

4      Issues of state law sentencing errors generally are not cognizable on federal habeas review,

5 unless the petitioner claims a deprivation of due process or equal protection due to the misapplication

6 of the sentencing law. <u>See</u> <u>Fetterly v. Paskett</u>, 997 F.2d 1295, 1300 (9th Cir. 1993), cert. denied, 115

7 S.Ct 290 (1994); <u>Featherstone v. Estelle</u>, 948 F.2d 1497, 1500 (9th Cir. 1991); <u>Estelle v. McGuire</u>, 112

8 S. Ct. 475, 480 (1991) (holding that "it is not the province of a federal habeas court to reexamine state

9 court determinations on state law questions"); <u>Miller v. Vasquez</u>, 868 F. 2d 1116, 1118-19 (9th Cir.

10 1989) (refusing to address sentence enhancement claim).  Moreover, "[c]onclusory allegations which

11 are not supported by a statement of specific facts do not warrant habeas relief." <u>James v. Borg</u>, 24 F.3d

12 20, 29 (9th Cir.1994).

13      A criminal defendant is entitled to due process at sentencing. <u>Gardner v. Florida</u>, 430 U.S. 349,

14 358 (1977). Federal courts must defer to a state court's interpretation of state sentencing laws. <u>Bueno v.

15 Hallahan</u>, 998 F. 2d 86, 88 (9th Cir. 1993). "Absent a showing of fundamental unfairness," a state

16 court's misapplication of its own sentencing laws does not justify federal habeas relief." <u>Christian v.

17 Rhode</u>, 41 F. 3d 461, 469 (9th Cir. 1994). As a threshold matter, the court must determine whether

18 Petitioner has alleged that his sentence is fundamentally unfair.

19      A showing of fundamental unfairness has been found under two circumstances. The first is

20 where a state court imposed a sentence in excess of state law. (<u>Walker v. Endell</u>, 850 F. 2d 470, 476

21 (9th Cir. 19970; <u>see</u> <u>also</u>, <u>Marzano v. Kincheloe</u>, 915 F.2d 549, 552 (9th Cir. 1990) (guilty plea does

22 not permit state court to impose a sentence in excess of state law despite agreement of defendant to

23 sentence). The second is where a state court enhanced a sentence based on materially false or unreliable

24 information or based on a conviction infected by constitutional error. <u>See United States v. Hanna</u>, 49

25 F.3d 572, 577 (9th Cir. 1995); <u>Walker</u>, 850 F. 2d at 477. Generally, a federal habeas court will not

26 review a state sentence that is within statutory limits. <u>Id</u>. at 476.

      3. <u>Analysis</u>.

28      Assuming, that Petitioner has successfully pleaded a federal claim rather than merely a violation

48

of California law, his claim must still be rejected.  Petitioner claims that he was denied due process as well as his Sixth Amendment right to jury trial when the judge, rather than a jury, found it necessary to impose consecutive sentences. To support his assertion, Petitioner relies upon Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and Booker. (Doc. 30, p. 40).

Although People v. Black, 35 Cal.4th 1238, 29 Cal.Rptr.3d 740, 113 P.3d 534 (2005), the case that the 5th DCA referenced when disposing of Petitioner's claim, was abrogated by Cunningham v. California, 549 U.S. 270, 275, 127 S.Ct. 856, 861, 166 L.Ed.2d 85  (2007), which held California's determinative sentencing law to be unconstitutional, Cunningham only addressed the issue of when judges are permitted to find facts necessary to impose a sentence *above the statutory maximum* and did not address the constitutionality of a judge's ability to impose consecutive sentences. Therefore, Cunningham is inapposite to Petitioner's claim.

However, in Oregon v. Ice, ⸺ U.S. ⸺, 129 S.Ct. 711, 172 L.Ed.2d 517 (2009), the United States Supreme Court did address the issue of whether a judge, instead of a jury, may determine facts that are declared necessary to impose consecutive sentences in light of Apprendi and Blakely.  The Court held that the practice of allowing judges to determine whether sentences for discrete offenses should be imposed consecutively or concurrently is not in violation of the Sixth Amendment as interpreted in Apprendi and Blakely.  Ice, 129 S.Ct. at 714–715.  In delivering the majority's holding, Justice Ginsburg explained that "[t]he decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law.' Instead, specification of the regime for administering multiple sentences has long been considered the prerogative of state legislatures." Id. at 717 (citing Apprendi, 530 U.S. at 477, 120 S.Ct. 2356) (internal citation omitted).

Before Ice may be applied to the case at hand, however, the issue of retroactivity must be addressed by applying the standard expressed in Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); Butler v. Curry, 528 F.3d 624, 633 (9th Cir.2008) (citing Beard v. Banks, 542 U.S. 406, 412, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004)) (stating that when issues of retroactivity arise "'federal habeas courts must apply Teague before considering the merits' of a claim"). The first step in applying Teague is to determine whether the new decision expressed a "new rule" or an "old rule" with

regard to prior precedent in force at the time Petitioner's conviction became final (i.e. when Petitioner exhausted direct review options in state court). Teague, 489 U.S. at 301, 109 S.Ct. at 1070; Butler, 528 F.3d at 633–34. While "new rules" only apply retroactively on direct review, "old rules" are retroactively applicable on both collateral as well as direct review. Whorton v. Bockting, 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007); Butler, 528 F.3d at 633. "Old rules" are those where the result was dictated by then-existing precedent at the time the petitioner's conviction became final. Teague, 489 U.S. at 301, 109 S.Ct. at 1070; Butler, 528 F.3d at 633–34.

    The rule expressed in Ice can be considered an "old rule" under the Teague analysis because the rule is dictated by precedent as set forth in the Apprendi line of cases. Ice, 129 S.Ct. at 716–17. As Justice Ginsburg's majority opinion points out, an analysis under Apprendi and its progeny requires a determination of whether the particular situation at issue is "within 'the domain of the jury ... by those who framed the Bill of Rights.'" Id. at 717 (quoting Harris v. United States, 536 U.S. 545, 557, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002)). Thus, an analysis of whether an issue falls under the Apprendi rule must be done through an examination of the historical record. See id. This was already the required analysis on January 21, 2009, when the United States Supreme Court denied Petitioner's request for a writ of certiorari to review the California Supreme Court's published decision affirming Petitioner's conviction and sentence, thus making Petitioner's direct review "final." See id.  Because the rule expressed in Ice was dictated by precedent that was in force when Petitioner's conviction became final, it is an "old rule" that may be retroactively applied to the case at hand. See Teague, 489 U.S. at 301; Butler, 528 F.3d at 633–34.

    The majority opinion in Ice performed a thorough examination of the considerations necessary to analyze the issue at hand through the scope of existing Supreme Court precedent, including Apprendi, its progeny, and necessary historical practices. Id . at 717–719. The Court's final determination in Ice, based on the analysis of its own precedent (most of which was in force in 2005), was that judges may themselves decide the facts necessary to impose consecutive sentences. Ice, 129 S.Ct. at 714-15.

    Despite the fact that, in deciding this issue, the California Court of Appeal relied on People v. Black, which was later abrogated by the Supreme Court in Cunningham, the Court finds, for the

foregoing reasons, that the decision of the 5th DCA was not contrary to federal law as interpreted by the Supreme Court, nor was it an unreasonable application of the same. Accordingly, Petitioner is not entitled to habeas relief on this claim.

    I. Ineffective Assistance Of Trial Counsel.

    Finally, Petitioner contends that he was denied his right to the effective assistance of counsel. This contention is also without merit.

    1. Federal Standard.

    Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of appellate counsel are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of appellate counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

    To prevail, Petitioner must show two things. First, he must establish that appellate counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the appeal. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

    With the passage of the AEDPA, habeas relief may only be granted if the state unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v. Mirzayance,129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007);

1   Knowles, 129 S.Ct. at 1420.  In effect, the AEDPA standard is "doubly deferential" because it requires

2   that it be shown not only that the state court determination was erroneous, but also that it was

3   objectively unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the

4   Strickland standard is a general standard, a state court has even more latitude to reasonably determine

5   that a defendant has not satisfied that standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)

6   ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.

7   The more general the rule, the more leeway courts have in reaching outcomes in case-by-case

8   determinations").

9                    2.  Analysis.

10          Petitioner's argument is based upon his assertion that, had his trial counsel at the third trial, Mr.

11   Gardina, impeached Curtis with the information regarding the police investigation into the later

12   shooting at the "Mr. Fast" convenience store, there is a reasonable probability that Petitioner would

13   have been acquitted.  The Court disagrees.

14          Initially, it must be emphasized that Petitioner's contention goes only to the second Strickland

15   prong, i.e., prejudice, and does nothing to persuade the Court that, by refusing to impeach Curtis with

16   the evidence of the Mr. Fast shooting, counsel's performance fell below an accepted standard of

17   reasonableness.  Indeed, quite the opposite appears from the record. At the first trial, Petitioner's

18   attorney, Mr. Dickow, impeached Curtis with the evidence concerning the Mr. Fast incident, and

19   whether Curtis had lied to police about having a gun while in the store.  Although defense counsel tried

20   to strictly limit Curtis's answers, ultimately, it was impossible to ask Curtis about being armed without

21   allowing him to explain why he was armed.  Thus, after Curtis admitted be being armed, contrary to his

22   statement to police, the court allowed Curtis to explain why he was armed, as follows:

23          I received numerous threats, my family's been threatened, um, there was mention of someone
            having a hit out on me, uh, and basically, when the District Attorney's Office provided for me
24          to relocate.  [¶] One or two months after I relocate, I get a call from an Investigator Newport, I
            talked to him and he told me that the state was short on funds, so, there was no more support
25          for me to be anywhere, so, basically, I was forced to come back into Bakersfield, and, you
            know, with having been threatened and my family being threatened, my life being threatened,
26          I'm very concerned.  [¶]  I'm very worried about that. [¶] Yes, sir, I am.

27   (2 ART-FT 261-264).

28          Later, when asked to explain why he did not use the evidence at the third trial to impeach

52

Curtis, Mr. Gardina stated as follows:

> [I] was my opinion, supported by 25 years of trial experience, that it was in the best interest of my client to keep this information of a potential death threat and alleged contract for the murder of Curtis Rufus away from the jury. Had I opened the door by inquiring about the incident at Mr. Fast, I know that based upon past experience that the experienced deputy District Attorney trying the case would have inquired at length into the reasons that Curtis Rufus carried the gun in the first place, including Rufus' state of mind and his belief that my client, Arthur Lenix, had requested that members of [a] criminal street gang murder Rufus to prevent him from testifying at trial. In my opinion it would have been I.A.C. [ineffective assistance of counsel] to use the materials and to allow extremely prejudicial information to be presented to the jury as outlined above.

(Gardina Decl. at Para. 9).

"A disagreement with counsel's tactical decisions does not provide the basis for declaring that the representation was constitutionally deficient." Raley v. Ylst, 470 F.3d 792, 799 (9th Cir.2006) (citing United States v. Mayo, 646 F.2d 369, 375 (9th Cir.1981)). Indeed, informed strategic choices are "virtually unchallengeable." Strickland, 466 U.S. at 689-690, 104 S.Ct. 2052 (reasonable tactical decision by counsel with which the defendant disagrees cannot form the basis of an ineffective assistance of counsel claim). The habeas court does not consider whether another lawyer, with the benefit of hindsight, would have acted differently than trial counsel. Id. Instead, the court considers whether counsel made errors so serious that counsel failed to function as guaranteed by the Sixth Amendment. Id. at 687. Tactical decisions are not ineffective assistance simply because, in retrospect, better tactics are known to have been available, Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir.), cert. denied, 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984), or because the tactic did not succeed.

Here, Mr. Gardina was not operating with a blank canvas. Indeed, Gardina had the benefit of two prior trials, and the experiences of two prior defense attorneys, upon which to draw in making any strategic decisions at the third trial. One of the trials, the second, ended shortly after opening statements; however, the first trial involved the presentation of much of the evidence and testimony that would figure in the third trial. Significantly, in the first trial, as discussed above, Petitioner's attorney actually used the evidence from the investigation of the later convenience store shooting in an ill-fated attempt to impeach Curtis. The salient exchanges, discussed above, demonstrate that any minimal impeachment value of this evidence was accompanied by a significant potential detriment to Petitioner by "opening the door" to a discussion of why Curtis was carrying a gun into the convenience store, i.e.,

53

1    to protect himself from compatriots in Petitioner's gang whom, Curtis believed, Petitioner had ordered

2    to kill him.  Obviously, such testimony would have a tendency to be much more harmful than helpful to

3    Petitioner, and, balanced against the limited impeachment potential the evidence contained, a

4    reasonable attorney could have concluded that the risks of using the evidence far outweighed any

5    potential advantage.  Gardina himself indicated that, based upon his 25 years of trial experience and his

6    knowledge of the prosecutor, this was precisely the reason why he declined to use this information at

7    trial against Curtis.

8        It is rare that any defense attorney is permitted a "trial run" with volatile evidence, as Gardina

9    had in this case, by reading transcripts of Petitioner's first trial to see how the evidence at issue

10   essentially "backfired" on defense counsel.  Gardina made his informed decision based upon this

11   knowledge, and so this Court will not now attempt to second-guess counsel's reasonable trial strategy

12   with the advantage of eight years' worth of hindsight. Strickland, 466 U.S. at 689-690 (informed

13   strategic choices are "virtually unchallengeable").

14       Nevertheless, Petitioner contends the 5th DCA's reversal, People v. Johnson, 142 Cal.App.4[th]

15   770 (2006), of the conviction of his co-conspirator, Johnson, and the opinion's language that the

16   evidence related to Curtis's subsequent encounter with rival gang members at a convenience store,

17   would, if used by defense counsel at Petitioner's trial, have resulted in a different outcome.  Petitioner

18   is mistaken.

19       First, it bears emphasis that, in Johnson, the issue before the 5th DCA was not ineffective

20   assistance of trial counsel, but rather, prosecutorial misconduct in withholding discovery from

21   Johnson's defense counsel of the impeachment evidence regarding Curtis's encounter at the

22   convenience store.  As such, the appellate court applied the proper standard under Brady v. Maryland,

23   373 U.S. 83, 87 (1963), in assessing the legal import of the prosecution's conduct, rather than the

24   standard under Strickland, to assess defense counsel's performance.  As such, the focus in Johnson was

25   entirely on the prosecutor's responsibilities and conduct, while, in this case, the claim focuses entirely

26   on defense counsel's responsibilities and conduct, which are, to state the obvious, quite separate and

27   distinct from each other.  As the 5th DCA noted in Johnson, prosecutors are held to a higher standard of

28   responsibility than other attorneys in the criminal justice system because of their position and power,

54

1    and are expected to act in the interests of justice as well as of their clients.  By contrast, defense

2    attorneys often have legitimate and compelling strategic reasons for not presenting evidence that might,

3    in some fashion, be helpful to the accused, but also risks allowing more prejudicial evidence to be heard

4    by the jury as well.  Indeed, defense attorneys frequently refuse to allow their clients to testify in

5    criminal cases about their side of the story for precisely these reasons, e.g., impeachment by prior

6    convictions, inconsistent statements given to police, prior bad acts, gang affiliations, etc.

7            Second, it is important to remember that <u>Johnson</u> was being charged as an accomplice of

8    Petitioner in the shooting of the victim, and not as the shooter himself.  As such, Johnson's mental state

9    was critical to whether the jurors would convict him of the most serious charges, or would, instead, find

10   him either guilty of a lesser offense or even acquit him.  By contrast, Petitioner was always charged as

11   the shooter in this case, so Curtis's credibility about an unrelated incident would necessarily have a

12   more attenuated impact on any decision by jurors. Moreover, the evidence at issue, i.e., evidence of

13   Curtis's gang ties and lying about whether he had a gun, did not contain the same potential for

14   admission of prejudicial testimony against Johnson as it did for Petitioner since the jury in Johnson's

15   case, unlike the jurors in Petitioner's case, would not have been more likely to react negatively toward

16   Johnson merely because Curtis believed Petitioner was trying to kill him. In Petitioner's trial, of course,

17   such prejudice could have been substantial.

18           Based on the foregoing, the Court concludes that the state court's decision denying Petitioner's

19   claim of ineffective assistance of counsel was not objectively unreasonable.[4]

20                                              **<u>ORDER</u>**

21           For the foregoing reasons, it is HEREBY ORDERED that Petitioner's request for judicial

22   notice (Doc. 32), is GRANTED.

23   _____

24   [4] Respondent has discussed at length the procedural history of this issue and has made a strong case for the position that
     the state court's denial of this issue was on the merits.  (Doc. 36, pp. 74-79).  Ultimately, the determination whether the

25   state court's adjudication was on the merits affects only the degree of deference to which this Court must accord the state
     courts' findings of facts and legal determinations.  Mindful that reasonable minds might disagree concerning whether the

26   state court denial of Petitioner's ineffectiveness claim was on the merits, the Court does not need to resolve that issue
     since, under either independent review of the entire record or de novo review, the Court would reach the same conclusion

27   as it did by applying the deferential AEDPA standard.  Put another way, applying even the most non-deferential standard
     of review to this claim, and according no deference to the state court's decision, the Court concludes that trial counsel

28   could have had legitimate strategic reasons for not using the impeaching evidence.  Petitioner has failed to meet either
     prong of the <u>Strickland</u> standard, and, thus, Petitioner was not denied his right to the effective assistance of counsel.

                                                  55

1

## **<u>RECOMMENDATION</u>**

2        Accordingly, the Court RECOMMENDS that Petitioner's first amended petition (Doc. 30), be

3   DENIED with prejudice.

4        This Findings and Recommendation is submitted to the United States District Court Judge

5   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

6   Rules of Practice for the United States District Court, Eastern District of California.  Within twenty-one

7   (21) days after being served with a copy of this Findings and Recommendation, any party may file

8   written objections with the Court and serve a copy on all parties.  Such a document should be captioned

9   "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be

10  served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the

11  Objections.  The parties are advised that failure to file objections within the specified time may waive

12  the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

13

14  IT IS SO ORDERED.

15    Dated:   **July 21, 2014**                    **/s/ Jennifer L. Thurston**

16                                              UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28